JOHN B. BULGOZDY, Cal Bar. No. 219897
E-mail: bulgozdyj@sec.gov
CATHERINE W. BRILLIANT, Cal. Bar No. 229992
E-mail: brilliantc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Andrew G. Petillon, Associate Regional Director
John M. McCoy III, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile:  (323) 965-3908

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    vs.<br><br>ANDRES LEYVA,<br><br>        Defendant. | Case No. 3:09-cv-1565-JLS-NLS<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

**SUMMARY**

1.   This matter involves unlawful insider trading in the securities of Qualcomm Incorporated ("Qualcomm") by defendant Andres Leyva ("Leyva") prior to the announcement of Qualcomm's global settlement and new licensing agreement with Nokia Corporation ("Nokia") after the market closed on July 23, 2008.  Qualcomm and Nokia were set to begin trial on July 23 in Delaware to determine whether Nokia owed Qualcomm substantial royalty revenues after the companies' licensing agreement expired in April 2007.  On the morning of July 22, 2008, Leyva learned material, non-public information that Nokia had surprised Qualcomm with a significant settlement offer, which included an upfront payment of $2.5 billion.  Approximately two hours later, Leyva purchased 80 Qualcomm call option contracts at $.39 each with a strike price of $50 and an expiration date of August 16, 2008.

2. On July 23, 2008, Qualcomm and Nokia jointly announced the broad terms of a new licensing agreement and the global settlement of all litigation between them.  After the announcement, the price of Qualcomm's shares rose to $52.43 from the previous day's close of $44.82, a 17% increase.  Leyva sold all his options after the announcement and realized a profit of $34,739.98 from his trading on material, nonpublic information.

3. By engaging in the conduct described in this complaint, Andres Leyva, directly and indirectly, engaged in acts, practices, and courses of business in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

4. The Commission requests an order permanently restraining and enjoining Andres Leyva against future violations of the federal securities laws, ordering disgorgement of unlawful profits and prejudgment interest thereon, and imposing civil penalties against Leyva.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(e), 21A(a)(1), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(e), 78u-1(a)(1) & 78aa.  Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, and courses of business alleged in this complaint.

6. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district.

## THE DEFENDANT

7. Andres Leyva, age 35, resides in Aventura, Florida.  Leyva worked for Qualcomm from December 2001 until his termination from the company in August 2008.  From November 2007 to August 2008, Leyva was the Director of Strategic Marketing Analysis in the Qualcomm Technology Licensing ("QTL") group.  While working for Qualcomm, Leyva lived in San Diego, California.

///

**RELATED ENTITY**

8. Qualcomm is a Delaware corporation with its principal offices in San Diego, California. Qualcomm develops, manufactures, and markets digital wireless telecommunications products and services, and through its QTL division, licenses patented technologies that are the industry standard for 3G mobile phones. Qualcomm's common stock trades on the NASDAQ Global Select Market under the symbol "QCOM."

**FACTS**

**Leyva's Responsibilities and Access to Material,**

**Nonpublic Information about the Qualcomm-Nokia Settlement Negotiations**

9. Qualcomm hired Leyva to work as a financial analyst in the QTL group in December 2001. In November 2007, Leyva was promoted to QTL's Director of Strategic Marketing Analysis. In that position, Leyva reported directly to QTL's Vice President of Strategic Marketing Analysis and Contract, and also worked for QTL's Vice President of Finance. Levya performed various duties relating to Qualcomm's licensing agreements and licensees' monthly royalty reports.

10. During the relevant period, Qualcomm had an insider trading policy barring all Qualcomm employees who are "aware of material nonpublic information relating to Qualcomm" from buying or selling Qualcomm securities or "engaging in any other action to take personal advantage of that information." Qualcomm's policy explicitly identified as examples of "material" information "positive or negative information . . . which could reasonably be expected to affect the trading price of Qualcomm's securities" concerning, among other things, "[a]ctual or threatened major litigation, regulatory action or the resolution of such litigation or regulatory action." Qualcomm sent all of its employees, including Leyva, periodic email reminders about the insider trading policy and the use of confidential information.

11. Qualcomm derives significant royalty revenues from a limited number of licensees, including Nokia. A licensing agreement between Qualcomm and Nokia expired in April 2007. Two years before that agreement expired, the two companies began a legal battle over wireless technology patents. This included numerous legal actions filed in different

1  jurisdictions around the world, including a case filed in Delaware that could potentially impact
2  other cases. After the licensing agreement expired in 2007, the focus of the legal dispute shifted
3  to whether Nokia owed Qualcomm royalties under the expired agreement and, if so, for which
4  wireless technologies and at what royalty rates.

5    12. Beginning in late 2006, Qualcomm and Nokia engaged in negotiations in an effort
6  to resolve their licensing disputes. Leyva worked directly with QTL's Senior Vice President
7  who led Qualcomm's team negotiating with Nokia ("Qualcomm's Lead Negotiator"), and his
8  duties included "running the numbers" on various potential settlement proposals.

9    13. Leyva attended brainstorming sessions with Qualcomm's litigation and
10 negotiating team about settlement discussions with Nokia. Starting at least in late 2006, Leyva
11 ran hundreds of financial impact analyses of different outcomes of each successive lawsuit with
12 Nokia and the impact each would have on Qualcomm's litigation and settlement strategies.
13 Leyva built a highly confidential database and financial sensitivity model, which Qualcomm
14 executives used to assess the financial impact of numerous settlement scenarios in the various
15 pending cases.

16   14. In May 2008, Leyva attended a settlement meeting between Qualcomm and Nokia
17 in Los Angeles. After the meeting, Qualcomm proposed that Nokia make an upfront payment of
18 about $4 billion. Nokia countered with a proposal to make an upfront payment between $300
19 and $500 million. In subsequent discussions, Qualcomm and Nokia were unable to bridge the
20 gap between Qualcomm's $4 billion demand and Nokia's $300-$500 million counterproposal.

21   15. Leyva participated in two telephonic settlement discussions between Qualcomm
22 and Nokia following the May 2008 meeting, but those discussions did not bring Nokia and
23 Qualcomm any closer to a resolution. Trial was set to begin in the key Delaware case on July 23,
24 2008, and as of mid-July 2008, it appeared unlikely that a pre-trial resolution would be reached.

25   16. Leyva's superiors and the Qualcomm legal team continually impressed upon
26 Leyva the highly confidential and privileged nature of the settlement discussions, as well as of
27 Leyva's financial analyses of different settlement scenarios. Leyva was instructed to mark
28 documents that he created for the Qualcomm-Nokia negotiations as "privileged" and/or "done at

the direction of counsel." Levya knew, or reasonably should have known, that information he learned about a settlement in the course of his duties was confidential and highly sensitive.

**Leyva Purchases Qualcomm Options While in Possession of Material, Nonpublic Information about Settlement Negotiations Between Qualcomm and Nokia**

17. On or about July 16, 2008, Nokia negotiators suggested to Qualcomm that the parties meet in Delaware before the start of the trial on July 23 to make one more attempt to reach a settlement. Given the long history of failed negotiations, Qualcomm representatives did not anticipate that these discussions would be fruitful. Nevertheless, upon arriving in Delaware on July 21 to prepare for trial, Qualcomm's President and Qualcomm's Lead Negotiator met with Nokia representatives. Leyva was not on the Delaware trial team, and he remained in San Diego at Qualcomm's offices.

18. On July 22, 2008, at a meeting held before 7:30 a.m. (PT), Nokia surprised Qualcomm with a substantial offer regarding the royalty fees owed Qualcomm by Nokia for sales after April 2007. As part of an overall settlement, Nokia offered to make a $2.5 billion upfront payment to Qualcomm.

19. Qualcomm's Lead Negotiator called Leyva at approximately 7:30 a.m. (PT) as Leyva was driving to work. During the call, Leyva was informed that Nokia had increased its offer of an upfront payment from $500 million to $2.5 billion. Leyva understood that this was a significant move by Nokia in the settlement negotiations. Leyva was instructed to run a quick financial impact analysis factoring in this significant new development. Because time was of the essence and Leyva was closer to his home than to Qualcomm's offices, he drove home to conduct the requested analysis. At approximately 7:51 a.m. (PT), after completing the assignment, Leyva telephoned Qualcomm's Lead Negotiator and reported the results.

20. Leyva drove to Qualcomm's office shortly thereafter. Once at his office, at 8:43 a.m. (PT), Leyva accessed Yahoo! Finance on his Qualcomm computer and checked the availability of Qualcomm put/call options. Over the next 71 minutes, Leyva fielded telephone calls from Qualcomm executives regarding Nokia's new settlement proposal while simultaneously logging on to his E*Trade account and previewing Qualcomm call options.

21.     At 9:45 a.m. (PT) on July 22, 2008, after placing and canceling two back-to-back orders for 80 Qualcomm call options, Leyva purchased 80 Qualcomm call option contracts priced at $.39 each. A call option is a security that gives the buyer of the option the right to demand that the option writer sells shares at the exercise price for a specified period of time. The options Leyva purchased gave him the right to purchase Qualcomm securities at a strike price of $50 until the options expired on August 16, 2008. Leyva acted with scienter in the purchase of the call options while in possession of material and nonpublic information about Qualcomm's settlement negotiations with Nokia.

22.     On July 23, 2008, just before the Delaware trial was set to begin, the companies notified the Delaware court that they had reached a settlement. The terms of the settlement were substantially the same as the terms that Leyva had learned on the morning of July 22.

23.     While Qualcomm representatives finalized the settlement papers, Levya worked closely with Qualcomm's Comptroller, other senior Qualcomm executives, and Qualcomm's accounting department to determine the impact of the settlement on Qualcomm's fourth quarter earnings forecast, that had been scheduled for release immediately after trading closed on July 23.

24.     At approximately 8:00 a.m. (PT) on July 23, Leyva attended a two-to-three hour meeting at Qualcomm's offices where he explained his financial modeling of the settlement to senior Qualcomm executives and discussed the accounting treatment for the settlement. At the end of the meeting, Leyva and the other attendees were informed that Qualcomm was about to sign off on the settlement and were reminded not to trade in Qualcomm securities prior to a public announcement of the news.

25.     At 3:35 p.m. (PT) on July 23, Leyva ran a Google search on his computer for the term "10b5-1."

26.     After the market closed on July 23, Qualcomm and Nokia jointly announced the broad terms of their new licensing agreement and the global settlement of all litigation between them. Qualcomm also released its third quarter earnings report, which was in line with the company's forecasts and analyst expectations.

27.     Before the market opened on July 24, Qualcomm released its fourth quarter

forecast and held an earnings conference call.  Qualcomm forecast that its Q4 earnings would be lower than Q3 earnings, and $0.04 less than 2007 Q4 earnings, excluding the estimated impact of the Nokia deal.  However, Qualcomm announced that the settlement with Nokia would add approximately $0.07 to $0.13 to its Q4 earnings per share.

28. During trading on July 24, Qualcomm's trading volume rose 394% and its stock price closed at $52.43, reflecting a rise of $7.61 or 17% from the previous day.  That same day, Leyva sold the 80 Qualcomm call option contracts for a profit of $34,739.98.

**Qualcomm Terminates Leyva**

29. On August 19, 2008, Qualcomm human resources and legal personnel called Leyva to a meeting where they questioned him about his suspicious trading in Qualcomm options prior to announcement of the settlement with Nokia.  Leyva stated that he purchased the Qualcomm options on Friday, July 18, and that he did not know on July 18 about the possibility of a settlement with Nokia.  After that meeting, Leyva told Qualcomm's Lead Negotiator about the meeting, and again stated that he purchased Qualcomm options on Friday, July 18, before Nokia had made its $2.5 billion offer.

30. However, later on August 19, 2008, Leyva told Qualcomm's human resources and legal personnel, and Qualcomm's Lead Negotiator, that he had in fact purchased Qualcomm options on Tuesday, July 22, the day that he learned about Nokia's surprise settlement offer.

31. Qualcomm placed Leyva on paid administrative leave on August 20, 2008.  On August 25, 2008, Qualcomm terminated Leyva for violating Qualcomm's insider trading policy.

**CLAIM FOR RELIEF**

**FRAUD IN CONNECTION WITH THE**

**PURCHASE OR SALE OF SECURITIES**

**Violations of Section 10(b) of the Exchange Act**

**and Rule 10b-5 Thereunder**

32. The Commission realleges and incorporates by reference paragraphs 1 through 31 above.

33. Defendant Andres Leyva, by engaging in the conduct described above, directly or

indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

34. By engaging in the conduct described above, defendant Andres Leyva violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Issue a final judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining defendant Leyva and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the final judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**II.**

Order Leyva to disgorge all ill-gotten gains from his illegal conduct, together with prejudgment interest thereon.

**III.**

Order Leyva to pay a civil penalty under Section 21A(a) of the Exchange Act, 15 U.S.C. § 78u-1(a).

///

**IV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**V.**

Grant such other and further relief as this Court may determine to be just and necessary.

DATED: July 21, 2009                    /s/ John B. Bulgozdy
                                                                John B. Bulgozdy
                                                                Catherine W. Brilliant
                                                                Attorneys for Plaintiff
                                                                Securities and Exchange Commission