1   STANLEY C. MORRIS. ESQ. (BAR NO. 183620)
    EMAIL:SCM@CORMORLLP.COM
2   BRIAN T. CORRIGAN, ESQ. (BAR NO. 143188)
    EMAIL: BCORRIGAN@CORMORLLP.COM
3

4   **CORRIGAN & MORRIS LLP**
    201 SANTA MONICA BOULEVARD, SUITE 475
5   SANTA MONICA. CALIFORNIA 90401-2212
    TELEPHONE: (310) 394-2800
6   FACSIMILE: (310) 394-2825

7   *Attorneys for* Defendant
8   ANDRES LEYVA

9

10                  **UNITED STATES DISTRICT COURT**

11                **SOUTHERN DISTRICT OF CALIFORNIA**

12

13  SECURITIES AND EXCHANGE          Case No.: 3:09 CV 06-1565 JLS-NLS
14  COMMISSION,
15              Plaintiff,           **DEFENDANT ANDRES LEYVA'S**
16       v.                          **ANSWER TO THE FIRST**
17  ANDRES LEYVA,                    **AMENDED COMPLAINT**
18              Defendant.
19                                   **JURY TRIAL DEMANDED**
20
21                                   Judge: Hon. Janis L. Sammartino
22                                   Courtroom: 6, 3rd Floor
23
24
25
26
27
28
    ───────────────────────────────────────────────
    *DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT
    AND DEMAND FOR JURY TRIAL*

                              1

Defendant Andres Leyva ("Leyva"), through counsel, answers the unverified first amended complaint in the above-captioned matter as follows:

## SUMMARY

1.      Answering paragraph 1, Mr. Leyva alleges that much of the first paragraph contains legal conclusions as to which no answer is necessary. To the extent a response is deemed necessary, Mr. Leyva denies the allegations in the first sentence in paragraph 1 of the Complaint. Mr. Leyva specifically denies that he ever learned any material information prior to trading in the securities of Qualcomm. Mr. Leyva admits that, during July 2008, there were over a dozen separate law suits pending between Nokia and Qualcomm and that one of those law suits had a trial date set for July 23, 2009. Leyva denies that, at the time he executed the option trade at issue, he had a reasonable basis to believe that the settlement of such litigation was any more likely than was publicly known (lawsuits often settle on the courthouse steps). Leyva denies that he was aware that Nokia increased the cash component of its settlement offer to $2.5 billion, and avers that such fact would not have been material information to him in any event.

Thus, when Leyva made his option trade, he did not believe a settlement with Nokia was possible, much less imminent.

---

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL*

1

2

3

4

5

6

7

8

9 ██████████████ The European Union was, and still is, investigating

10 Qualcomm's compliance of those commitments. ██████████████

11

12

13

14

15 ██████████████████ Accordingly, Leyva would

16 not have been the least bit influenced by news that Nokia had increased the cash

17 component of its offer to $2.5 billion, even if he had known it, which he did not.

18     2.

19

20

21

22

23

24

25

26

27

28

---

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT*
*AND DEMAND FOR JURY TRIAL*

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ██████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ██████████████████████████████████████████

9 ████████████████████████████████████

3.    ██████████████████████████████████████

10 ██████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████

13 ████████████████████████████████████████████ They did so by (1)

14 concealing the terms of the Nokia license agreement under the guise of a self-

15 serving confidentiality provision; ████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ██████████████████████████████████████████████

19 ██████████████████████████████████████████████

20 ██████████████████████████) Indeed, at that time, Leyva did not

21 think settlement was a realistic possibility, much less that settlement was

22 imminent.

23    4.    The SEC's Complaint contends that the precipitous rise of

24 Qualcomm's stock price on July 24, 2009 conclusively establishes the materiality

25 of the information Leyva possessed.  Leyva denies that assertion.  First, as stated

26 above, Leyva had no material information relative to the settlement agreement with

27 Nokia and certainly did not know or have reason to know that the settlement was

28 imminent.  Second, Qualcomm's press release after trading hours on July 23, 2008,

1   a true and correct copy of which is attached hereto at **Exhibit 2**, begins by

2   reporting record earnings, 19% higher than earnings reported for the quarter one

3   year earlier, which earnings did not include any revenue on the Nokia settlement.

4   This news may well have resulted in such stock price increase. Third, there are

5   myriad other factors in the financial markets and with respect to Qualcomm that

6   may well have resulted in such stock price increase. Fourth and finally, if the news

7   of the settlement was material, it would be impossible for the SEC or anyone else

8   to know or prove whether it was the settlement itself, ███████████████

9   ███████████████████████████████, which caused the

10  market price of Qualcomm's stock to rise on July 24, 2009.

11       5.    The press release of July 23, 2008 (Exhibit 2) omits the Nokia license

12  terms altogether, both the favorable term which the SEC alleges Leyva knew ($2.5

    billion in cash)████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ███████████████████████████

16       6.    ██████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████

20  █████████████████████████████████████

21  ████████████████████████████████████████████

22  ███████████████████ As the transcript of that analyst meeting (a true and correct

23  copy of which is attached hereto at **Exhibit 3**) reflects, Qualcomm's Chief

24  Executive Officer, Dr. Paul Jacobs, commences Qualcomm's presentation with a

25  statement that Qualcomm is "quite pleased" with the Nokia settlement. ███

26  ████████████████████████████████████████████

27  ██████████████████████████████████████████He then goes

28  on to apologize that: "Unfortunately we are constrained by a confidentiality

---

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL*

agreement with Nokia which does limit the amount that we can currently disclose regarding the specific terms of the deal." He omits that Qualcomm insisted on such confidentiality provision in order to conceal the favorable royalty terms provided to Nokia from the European Union and Qualcomm's other licensees. Qualcomm's President, Steve Altman, ███████████████████████████ claiming that he is "delighted with this outcome" and that he believes the settlement is "a very positive agreement for QUALCOMM". Mr. Altman predictably then apologizes that "(d)ue to the confidentiality agreement with Nokia, we will not be able to provide any more details on the terms of these transactions." Mr. Altman discusses a "very substantial" upfront payment, ████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████ At page 9 of the Question and Answer session in that analyst meeting, Tim Luke of Lehman Brothers specifically asks what impact the Nokia royalty rate would have on other licensees. Mr. Altman responds: "Okay. So, Tim we don't believe that our Nokia agreement impacts our most favorite provisions which I think is what you are getting at in our other license agreements. But I would say that if we offer the package at terms of the Nokia agreement to other licensees I would be very happy if those other licensees would accept the package of Nokia's terms and conditions and provide us with the same value that Nokia will provide us under our new agreement." ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

1  ███████████████████████████████████████████████

2  ████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ███████████████████████████████████████████████

5  ███████████████████████████████████████████████

6  ██████████████████████████████████   Finally, Richard

7  Windsor of Nomura makes the obvious point: "it would appear that Nokia got

8  some kind of discount". Mr. Windsor was able to connect the dots to figure out

9  that in order for Nokia, Qualcomm's largest customer, to give up a substantial

10  upfront cash payment, plus a release on the claims it had been asserting on the eve

of trial on such claims, ████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ██████████████████████████████████████████████

14  ██████████████████████████████████████

15  ███████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ███████████████████████████████████████████████

18  ██████████████████   "Well, I am not going to go in to much detail on that. I think we

19  received some valuable patents in a number of areas including some areas that we

20  haven't licensed today such as GSM. But in terms of how we derive additional

21  value from those patents, I am not at this point ready to give much detail on that."

22  The impact on the stock price, if at all related to the settlement, should be

23  █████████████████████████████████████████, rather than

24  the mere fact of the settlement. Leyva had no information that a settlement was

25  imminent, ████████████████████████████████████████

26  ███████████████████████████████████████████

27  █████████████████████████████████████████████████

28  ████████████████████████████████████

7.     In sum, Mr. Leyva did not possess material insider information regarding the likelihood of a settlement agreement with Nokia when he wagered $3,190, including commissions, on Qualcomm call options on July 22, 2008. Leyva admits that he purchased 80 Qualcomm options on July 22, 2008, the day before Qualcomm's earnings were publicly projected to be released, for a total of $3,120, which was similar to many of his other 208 option purchases and sales he made, with his management's knowledge and approval, over the previous two years for an aggregate gain of $666 on all Qualcomm options. Except as so admitted, Mr. Leyva denies each and every allegation contained in paragraph 1 of the Complaint.

8.     Answering paragraph 2, Leyva incorporates by reference his responses at paragraphs 1 through 7 above.  Leyva lacks sufficient information or belief to admit or deny the exact amount that Qualcomm's stock price increased on July 24, 2008 or the reasons for such increase and on that basis denies the allegation. Except as expressly admitted, Mr. Leyva denies each and every allegation contained in paragraph 2 of the Complaint.

9.     Answering paragraph 3, Mr. Leyva denies each and every allegation in paragraph 3.

10.     Leyva alleges that paragraph 4 is a statement of remedies sought by the SEC and does not require a response by Leyva.

**JURISDICTION AND VENUE**

11.     Answering paragraph 5, Leyva admits that the court has jurisdiction over this action pursuant to the specified statutes. Except as so expressly admitted, Leyva denies the allegations.

12.     Answering paragraph 6, Leyva admits that venue is proper in this district. Except as so expressly admitted, Leyva denies the allegations.

**DEFENDANT**

13.     Answering paragraph 7, Leyva admits the allegations.

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL*

**RELATED ENTITY**

14.     Answering paragraph 8, Leyva lacks sufficient information or belief to admit or deny the allegations and on that basis denies the allegations.

**ALLEGATIONS**

15.     Answering paragraph 9, Leyva admits that he worked at Qualcomm from December 2001 until August 2008. Leyva admits that he served as a financial analyst in Qualcomm's licensing division and held positions of increasing responsibility including QUALCOMM'S Director of Strategic Marketing Analysis. Leyva further admits that he reported to QUALCOMM'S Vice President of Strategic Marketing Analysis and Contracts, and also worked for QUALCOMM'S Vice President of Finance. Leyva performed various duties relating to Qualcomm's licensing agreements and licensees' quarterly royalty reports. Except as so admitted, Mr. Leyva denies each and every allegation contained in paragraph 9 of the Complaint.

16.     Answering paragraph 10, Leyva denies that Qualcomm sent all of its employees, including Leyva, periodic email reminders about the insider trading policy and the use of confidential information. In regard to the remaining allegations, Leyva lacks sufficient information or belief to admit or deny the allegations and on that basis denies the allegations in paragraph 10 of the complaint.

17.     Answering paragraph 11, Leyva admits that there were over a dozen law suits with claims and cross-claims pending between Qualcomm and Nokia. Leyva admits that Nokia filed a formal complaint with the European Union DG COMP. Leyva admits that Qualcomm's 2001 license with Nokia expired in part in April 2007 and that under the terms of that previous license ███████████████

████████████████████████████████████████

██████████ Nokia ceased making any payment in April 2007 until August 2008.

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT*
*AND DEMAND FOR JURY TRIAL*

1  Leyva admits that Nokia and Qualcomm were negotiating a new license through

2  August 2008, which would include a make-up for Nokia's failure to pay any

3  royalties since April 2007. █████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████          ████████████████████

9  ████████████████████████████████████████████

10  █████████████████████████████ Except as expressly admitted, Leyva

11  denies the allegations in paragraph 11.

12        18.    Answering paragraph 12, Leyva admits that he was asked by

13  Qualcomm's management to create a financial model to calculate the effective

14  royalty rate that would result from various licensing agreement scenarios that

15  Qualcomm and Nokia were considering as part of their ongoing licensing

16  negotiations. Leyva avers that under Nokia's expired 2001 License, ████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

20  ██████████████████████████████████████████

21  ██████████████████████████████████████████

22  ██████████████████████████████████████████

23  ███████████████████████████████████████████

24  ███████████████████████████████████████████

25  ██████████████████████████████████████████

26  ██████████████          ████████████████████

████████████████████████████████████████

28

1

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████   Except as expressly admitted, Leyva denies the

14   allegations in paragraph 12.

15        19.    Answering paragraph 13, Leyva denies that he was a member of the

16   litigation team, and further denies that he ever ran any financial analysis on the

17   impact of any lawsuit.  Leyva admits that he was involved in analyzing licensing

18   contracts and, with respect to Nokia, ████████████████████████████████████

19   ██████████████████████████████████████████████████████████████████ d

20   changes to Nokia's licensing agreement.  Leyva specifically denies that he ever

21   was involved in analyzing the financial impact on Qualcomm that a litigation or

22   settlement would have. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

27   Except as expressly admitted, Leyva denies the allegations in paragraph 13.

28

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT*
*AND DEMAND FOR JURY TRIAL*

20.     Answering paragraph 14, Leyva denies that he attended settlement discussions in Los Angeles in May 2008. Leyva admits that he attended a licensing negotiation meeting in early April 2008 ███████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ Leyva denies that the

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████, as it was, at all relevant times, a cash rich business. █████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

Leyva lacks sufficient information or belief to admit or deny the remaining allegations, and on that basis denies the allegations.

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL*

21.   Answering paragraph 15, Leyva admits that he participated in many licensing negotiations meetings with Nokia, but all had failed because Nokia demanded a large reduction in the royalty rate it paid Qualcomm. Qualcomm, at all relevant times, made clear to Nokia that such a reduction was unacceptable to Qualcomm ██████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ███ Leyva further admits that one of the cases between Nokia and Qualcomm was set to begin trial on July 23, 2008. Leyva admits that as of mid-July 2008, and through the date of his option trade, ████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ █████████ that Nokia insisted on such a term, and that, accordingly, no settlement between Nokia and Qualcomm was possible, much less likely or imminent. Except as expressly admitted, Leyva lacks sufficient information or belief to admit or deny the remaining allegations, and on that basis denies the allegations.

22.   Answering paragraph 16, ████████████████████████████ ██████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████ Leyva further admits that Qualcomm instructed Leyva to mark documents as attorney-client privileged and attorney work product, ██████████████████████████████████

---

1   ██████████████████████████ Except as expressly admitted, Leyva lacks

2   sufficient information or belief to admit or deny the remaining allegations, and on

3   that basis denies the allegations.

4       23.     Answering paragraph 17, Leyva admits that he remained in San

5   Diego and was not a part of the litigation team that went to Delaware to meet with

6   Nokia's litigation team prior to the July 23, 2008 trial. Except as expressly

7   admitted, Leyva lacks sufficient information or belief to admit or deny the remaining

8   allegations, and on that basis denies the allegations.

9       24.     Answering paragraph 18, Leyva lacks sufficient information or belief

10  to admit or deny the allegations, and on that basis denies the allegations regarding

11  when the $2.5 billion payment was agreed to by Nokia. Leyva avers that, in any

12  event, such a proposal by Nokia would have been immaterial information, in that it

13  would not make the settlement more likely to occur, ███████████████████

14  █████████████████████████████████████████████████

15  █████████████████████████████████████████████████

16  ████████████████████████████ Except as expressly

17  admitted, Leyva lacks sufficient information or belief to admit or deny the remaining

18  allegations, and on that basis denies the allegations.

19      25.     Answering paragraph 19, Leyva denies that he was told before his

20  option trade at issue in this case that Nokia had agreed to increase the upfront

21  payment from $500 million to $2.5 billion or that this fact would have been

22  "significant" in terms of assessing the likelihood that Nokia and Qualcomm would

23  be able to reach a settlement in principal. ███████████████████

    █████████████████████████████████████████████████

    █████████████████████████████████████████████████

    ██ ███████  ████████████████████████████████████

27  ██████████████████████████████████████ Leyva

28

---

1  admits that Derek Aberle, the lead negotiator with Nokia, did phone him from

2  Delaware at approximately 10:30 a.m. EST (7:30 a.m. PST) on the Morning of

3  July 22, 2008 and did ask Leyva to make a change in the model, ███████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████ Leyva admits that he did make

7  that change from his home, ██████████████████████████████████████

8  █████████████ Except as expressly admitted, Leyva denies the allegations in

9  paragraph 19.

10       26.    Answering paragraph 20, Leyva admits that he arrived to his office at

11  Qualcomm at around 8:43 a.m. Leyva admits that he checked Qualcomm's stock

12  price. Leyva denies that he talked to Qualcomm executives for the next 71 minutes

13  about the Nokia settlement. He did have some calls, but not for 71 minutes, and

14  "settlement" was never discussed, inasmuch as Leyva was responsible for

15  calculations relative to the Nokia license, not the Nokia settlement. Leyva avers

16  that he had plenty of time to place his stock trades from his home after making the

17  changes to the model before coming into the office, but did not do so because the

18  option trade had nothing to do with the model adjustments or the Nokia settlement.

19  Leyva avers that he had plenty of time to place stock trades after arriving at the

20  office and turning on his computer at 8:43 a.m., but was in no rush to do so

21  because the option trade had nothing to do with the model adjustments or the

22  Nokia settlement. Except as expressly admitted, Leyva denies the allegations in

23  paragraph 20.

24       27.    Answering paragraph 21, Leyva admits that on July 22, 2008, the day

25  before earnings were to be announced and over 2.5 hour after receiving the call with

26  from Derek Aberle, he did attempt to place an option trade for 80 Qualcomm call

27  options (bullish position).  Leyva began bargain hunting for a cheap price on the calls

28

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT*
*AND DEMAND FOR JURY TRIAL*

1   -- decidedly not the behavior of someone with "hot" information. Leyva used a limit
2   order to attempt to obtain those 80 call option contracts cheaper than they were
3   trading. Again, that is not the conduct of a person acting on "hot" insider information.
4   When he could not get his initial lower price, he then increased his bid slightly. After
5   his second attempt at bargain hunting failed, he then increased his bid a third time.
6   Again, these multiple attempts to bargain hunt reflect an honest bidder, not someone
7   trying to take advantage of inside information. The third bid was accepted for a total
8   purchase price of $3,150, an amount far less than he had previously risked on short
9   term option trades before earnings and not an amount placed by a trader gambling
10  based on material insider information. Leyva avers that had he been trading on inside
11  information, which he was not, he would not have wasted two and a half hours, he
12  would have executed the trade from home where he made the adjustments to the
13  license spreadsheet at Aberle's direction. He would not have waited two and a half
14  hours before making that trade. He also would have made the trade from his home,
15  where Qualcomm could not trace his every computer entry. He would not have
16  traveled to the office and make the trade at his office computer, where Qualcomm
17  could see exactly what he was doing. Most obviously, had Leyva been wagering
18  based on insider information, his wager would have been much more than the modest
19  $3150 wager placed, which amount was well within the range of option trades Leyva
20  had been making regularly and unsuccessfully 208 times over the prior twelve
21  months. This trade evidences nothing more than Leyva's normal and regular wager
22  on the daily fluctuation of Qualcomm's and other companies' stock price, not an
23  intent to wager based on insider information. Leyva admits that the call options he
24  purchased had strike price of $50 and expiration of August 16, 2008. Except as so
25  expressly admitted, Leyva denies the allegations in paragraph 21.
26        28.     Answering paragraph 22, Leyva denies that he knew the terms of the
27  settlement before he bought Qualcomm calls (a bullish trade). Specifically, Leyva
28

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT*
*AND DEMAND FOR JURY TRIAL*

1   denies that he knew (1) that it was more likely that Qualcomm and Nokia would

2   settle their litigation; (2) that Nokia had offered a $2.5 billion cash component; ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████   ██████████████████████████

███████████████████████████████████████████████████

████████████████████████████  ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████  ███

███   In regard to the first sentence in paragraph 22, Leyva lacks sufficient

14  information or belief to admit or deny the allegations of what Qualcomm or Nokia

15  told the court on the morning of July 23, 2008 shortly before their Delaware trial was

16  to begin and on that basis denies the allegation. Except as so expressly admitted,

17  Leyva denies the allegations in paragraph 22.

18      29.    Answering paragraph 23, Leyva denies the allegation that "he worked

19  closely with Qualcomm's accounting department to determine the impact of the

20  settlement on Qualcomm's fourth quarter earnings forecast, that had been scheduled

21  for release immediately after trading closed on July 23." Leyva's role was to analyze

22  the license terms with Nokia – as contrasted with the litigation settlement terms with

23  Nokia.  Leyva played no role in the latter negotiations, except to the extent that his

24  work on the license analysis was information needed by the Qualcomm executives

25  negotiating the litigation settlement.  Otherwise, Leyva played little or no role in the

26  litigation or its settlement. ██████████████████████████

███████████████████████████████████████████████████

28

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT*
*AND DEMAND FOR JURY TRIAL*

1

2 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Leyva was also not involved in

3 assessing the impact of Nokia's license on Qualcomm's earnings. Leyva admits that

4 approximate 15 hours after he traded, on July 23, 2008, ▉▉▉▉▉▉▉▉

5

6

7

8

9

10 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Except as expressly admitted, Leyva

11 denies the allegations in paragraph 23.

12         30.     Answering paragraph 24, Leyva admits that his late night

13 conversations were not productive, so approximate 24 hours after he traded, on July

14 23, 2008, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL_

1

███████████████████████████████████

███████████████████████ Leyva admits that later he was told, the

3   morning after he traded, that Qualcomm was about to agree to settle with Nokia and

4   not to trade Qualcomm until after such information became public. Except as

5   expressly admitted, Leyva denies the allegations in paragraph 24.

6        31.   Answering paragraph 25, Leyva admits that on the afternoon of July

7   23, 2008 (the day after he traded), a co-worker threatened to murder Leyva's wife

8   and child, and get him fired and deported by wrongfully accusing him of sexual

9   harassment, drug trafficking and insider trading. That day, the same co-worker wrote

10  "10b-5" on a grease board in Leyva's office. Not knowing what that meant, Leyva

11  admits running a Google search on 10b-5 from his office at Qualcomm. Notably,

12  Leyva spent only a very short time looking at the descriptions of the rule that he

13  found online, and took no action whatsoever based on what he found.  Indeed, Leyva

14  did not understand its implication to him at the time.  Leyva erased the reference

15  from his easel, and went on with his day, without taking any action based on such

16  research.  Except as expressly admitted, Leyva denies the allegations in paragraph 25.

17       32.   Answering paragraph 26, Leyva denies that the "broad terms" of the

18  settlement agreement were disclosed. Leyva avers that Qualcomm and Nokia both

19  failed to disclose and intentionally conspired to conceal that the public

20  announcements made on July 24, 2008 are reflected at **Exhibits 2 and 3**, as detailed

21  above.  Leyva avers that he did not know that Qualcomm would settle with Nokia,

22  did not know that Qualcomm would make a release about the settlement ███

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████████████ Leyva denies

27  that a new licensing agreement had been signed by Qualcomm and Nokia at the time

28

---

1  of the announcement, and in fact avers that a new licensing agreement was not

2  actually reached between Qualcomm and Nokia until months later. Except as

3  expressly admitted, Leyva denies the allegations in paragraph 26.

4    33. Answering paragraph 27, Leyva lacks sufficient information or belief

5  to admit or deny the allegations, and on that basis denies the allegations regarding

6  when the $2.5 billion payment was agreed to by Nokia.  Leyva further avers that he

7  was unaware at the time of his option trade what forecasts Qualcomm would be

8  making for its fourth quarter earnings, was unaware of a settlement with Qualcomm,

9  and had no idea what the terms of such settlement would be or its impact on

10  Qualcomm's fourth quarter earnings projections.  Except as expressly admitted,

11  Leyva denies the allegations in paragraph 27.

12    34. Answering paragraph 28, Leyva admits that he sold 80 call options for

13  a $34,740 profit on July 24, 2008. Except as expressly admitted, Leyva lacks

14  sufficient information or belief to admit or deny the remaining allegations in

15  paragraph 28 and on that basis denies the allegations.

16    35. Answering paragraph 29, Leyva admits that on August 19, 2008,

17  Qualcomm Human Resources and Legal departments called Leyva to a meeting.

18  Leyva admits that when asked by Qualcomm's human resource department in a

19  surprise meeting nearly one month after his July 22, 2008 option trade, he mistakenly

20  answered, off the top of his head, that he thought that he had purchased the 80 call

21  option contracts on July 18, 2008, and that such statement of his recollection was

22  made in utmost good faith.  Leyva also avers that, without further inquiry or

23  instruction from Qualcomm, Leyva immediately returned to his office and checked

24  his records and discovered that his trade had occurred on July 22, 2008, rather than

25  July 18, 2008, as mistakenly recalled. Leyva immediately and voluntarily, within one

26  hour of making his honest mistake regarding the date of such trade, and without

27  further prodding from anyone at Qualcomm, notified Qualcomm's in-house counsel

28

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT*
*AND DEMAND FOR JURY TRIAL*

and supervisor of his inadvertent error and of the correct timing of his trade.  Except as expressly admitted, Leyva lacks sufficient information or belief to admit or deny the remaining allegations in paragraph 29 and on that basis denies the allegations.

36.     Answering paragraph 30, Leyva incorporates his answer to paragraph 35 as if set forth in full at this place.  Leyva denies that he ever learned of "Nokia's surprise settlement offer" and further denies the contention that Nokia, on the eve of a trial with Qualcomm, would make a settlement offer.  Leyva avers ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████  Except as expressly admitted, Leyva denies the allegations in paragraph 30.

37.     Answering paragraph 31, Leyva admits that he was terminated on August 25, 2008.  Leyva is informed and believes that his termination by Qualcomm was based on Qualcomm's mistake arising out of the fact that Leyva's trading records reflect the time of the trade based on Eastern Standard Time (3 hours later), while the email sent to Leyva upon which Qualcomm based its termination is dated and timed based on Pacific Standard Time, from Qualcomm's offices in San Diego, California.  Had Qualcomm focused on such time entries, it would have seen that Leyva did not receive the email at issue until one hour **after** Leyva's option trade at issue in this case.  Except as expressly admitted, Leyva lacks sufficient information or belief to admit or deny the remaining allegations in paragraph 31 and on that basis denies the allegations.

## **CLAIM FOR RELIEF**

### **Fraud in Connection with the Purchase or Sale of Securities**

### **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

38.     Answering paragraph 32, Leyva incorporates by reference his admissions, denials, and allegations regarding paragraphs 1 through 37, inclusive.

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL*

1    39.    Answering paragraph 33, Leyva denies the allegations.

2    40.    Answering paragraph 34, Leyva denies the allegations.

3                    **PLAINTIFF'S PRAYER FOR RELIEF**

4         Leyva denies that the SEC is entitled to any relief whatsoever in connection

5    with the allegations set forth in the Complaint. To the extent Plaintiff's prayer for

6    relief states legal conclusions, no response is required.

7                        **AFFIRMATIVE DEFENSES**

8         Leyva alleges the following affirmative defenses to the allegations set forth

9    in the Complaint:

10                    **FIRST AFFIRMATIVE DEFENSE**

11                   **(Failure to State a Claim for Relief)**

12        The complaint and each claim for relief alleged therein fails to state facts

13   sufficient to constitute a claim for relief against Leyva.

14                   **SECOND AFFIRMATIVE DEFENSE**

15                     **(Advice of Professionals)**

16        Leyva is not liable for the Plaintiff's claims because he relied in good faith

17   upon the professional judgments of Qualcomm's legal professionals as to matters

18   which he reasonably believed to be within such persons' professional or expert

19   competence, ████████████████████████████████████

     ██████████████████████████████████████████████████

     ████████████████████████████████████████, and also that

22   Leyva need not be placed on a trading blackout list because his position at

23   Qualcomm would not expose him to receiving sufficiently material inside

24   information. In allegedly doing the acts complained of, Leyva acted on the direct

25   advice of a Qualcomm's counsel, executives and direct supervisor, who expressly

26   told him he had no restrictions on trading Qualcomm securities and who traded

27   herself in the securities of Qualcomm. He also discussed, on multiple occasions,

28

        *DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT*
                       *AND DEMAND FOR JURY TRIAL*

1   trading done on Qualcomm securities, other than employee stock options, by

2   employees higher ranked than him.

3   **THIRD AFFIRMATIVE DEFENSE**

4   **(Good Faith)**

5   In allegedly doing the acts complained of, Leyva acted in good faith ██████

6   ████████████████████████████████████████████

7   ████████████████████████████████████████

8   ██████████████████████████████████████████████

9   ██████████████████████████████████████████████

10   ████████████████████████████████████

11   ████████████████ In asserting this defense, Leyva incorporates his averments

12   throughout this answer. In addition, Leyva was told and understood from

13   Qualcomm that he was free, at all times, to trade in Qualcomm's securities because

14   he was not sufficiently high in the management of Qualcomm to warrant being

15   placed on Qualcomm's blackout list.

16   **FOURTH AFFIRMATIVE DEFENSE**

17   **(Injunctive Relief Not Warranted - No Likelihood of Future Violations)**

18   Plaintiff's claim for injunctive relief is barred because there has been no

19   violation of the Securities Act or the Exchange Act, and because Leyva has no

20   history of violations, was unaware that he was violating any laws, and did so, if at

21   all, in a very modest transaction. Leyva's life has been turned upside down as a

22   result of his inadvertent exposure to the Plaintiff's lawsuit, including that he has

23   been fired from his longstanding employment with Qualcomm, and his reputation

24   has been severely tarnished by the accusations contained in the SEC's complaint

25   and widely publicized by the SEC on its web site. There is no reasonable

26   likelihood that any violation will be repeated. Plaintiff's injunctive relief claim is

27

28

further barred because the adverse effects of an injunction far outweigh any benefit from an injunction. Therefore, the SEC is not entitled to injunctive relief.

### FIFTH AFFIRMATIVE DEFENSE

### (Lack of Scienter)

Any alleged conduct in this case by Leyva was without scienter.

### SIXTH AFFIRMATIVE DEFENSE

### (Lack of Materiality)

Plaintiff's complaint is barred on the basis that Leyva did not trade based on or even while in possession of material non-public information.  Leyva incorporates his averments throughout this Complaint.

Leyva did not learn that Nokia had increased the cash component of its offer to $2.5 billion,

Thus, Leyva did not learn any material insider information that would have been material to the likelihood that Qualcomm would reach a settlement with Nokia prior to making his option trade at issue in this action.

17  Accordingly, Leyva did not have any material inside information which would

18  have led a reasonable investor to believe that a settlement with Nokia was more

19  likely on July 23, 2008 than it had been on any other day leading up to the well-

20  publicized trial date.

## SEVENTH AFFIRMATIVE DEFENSE

### (Penalties Not Warranted)

23  Plaintiff's claim for penalties is barred because any alleged violation was

24  isolated and/or unintentional and Leyva has already suffered losses which are

25  disproportionate to his alleged wrongdoing, by virtue of his termination by

26  Qualcomm, and public dissemination of the SEC's complaint against him.

27

28

---

## EIGHTH AFFIRMATIVE DEFENSE

### (Equitable Doctrines)

Plaintiff's claims are barred under such equitable doctrines as the evidence demonstrates, including but not limited to the doctrines of estoppel, unclean hands, and laches.

## NINTH AFFIRMATIVE DEFENSE

### (Additional Affirmative Defenses)

By alleging the matters set forth in these defenses, Leyva does not allege or admit that he has the burden of proof and/or persuasion with respect to any of these matters. Leyva presently lacks sufficient knowledge or information on which to form a belief as to whether he may have available additional affirmative defenses. For this reason, Leyva reserves his right to assert affirmative and/or additional defenses in the event that discovery indicates that they would be appropriate.

**WHEREFORE,** Leyva prays for judgment as follows:

1.     That the SEC take nothing by virtue of its complaint;

2.     For entry of judgment in favor of Leyva and against the SEC;

3.     For costs incurred herein, including attorney's fees; and

4.     For such other and further relief as the Court may deem just and proper.


DATE: November 5, 2009

CORRIGAN & MORRIS LLP

By:    /s/Stanley C. Morris
Attorneys for Defendant Andres Leyva

---

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT*
*AND DEMAND FOR JURY TRIAL*

1

## **DEMAND FOR JURY TRIAL**

2

Defendant ANDRES LEYVA hereby demands a jury trial.

3

4

DATE:  November 5, 2009

5

Respectfully submitted
CORRIGAN & MORRIS LLP

6

7

By:  /s/ Stanley C. Morris

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

*DEFENDANT ANDRES LEYVA'S ANSWER TO FIRST AMENDED COMPLAINT*
*AND DEMAND FOR JURY TRIAL*



Exhibit 1 to Redacted Answer, page 000028



Exhibit 1 to Redacted Answer, page 000029



Exhibit 1 to Redacted Answer, page 000030



Exhibit 1 to Redacted Answer, page 000031

Exhibit 1 to Redacted Answer, page 000032



Exhibit 1 to Redacted Answer, page 000033

Exhibit 99.1

FOR IMMEDIATE RELEASE

Qualcomm Contact:
John Gilbert
Vice President of Investor and Industry Analyst Relations
1-858-658-4813 (ph) 1-858-651-9303 (fax)
e-mail:ir@qualcomm.com

**Qualcomm Announces Third Quarter Fiscal 2008 Results**
**Revenues $2.8 Billion, EPS $0.45**
**Pro Forma EPS $0.55**

SAN DIEGO — July 23, 2008 — Qualcomm Incorporated (Nasdaq: QCOM) today announced results for the third fiscal quarter of 2008 ended June 29, 2008.

Qualcomm's third quarter fiscal 2008 earnings conference call has been re-scheduled to Thursday, July 24, 2008, beginning at 8:00 a.m. Eastern Daylight Time (5:00 a.m. Pacific Daylight Time). Conference call details are included herein.

**Total Qualcomm (GAAP) Third Quarter Results**
Total Qualcomm results are reported in accordance with generally accepted accounting principles (GAAP).

Exhibit 2, page 000034

- Revenues: $2.8 billion, up 19 percent year-over-year and 6 percent sequentially.

- Net income: $748 million, down 6 percent year-over-year and 2 percent sequentially.

- Diluted earnings per share: $0.45, down 4 percent year-over-year and sequentially.

- Effective tax rate: 15 percent for the quarter. Fiscal 2008 estimated tax rate of approximately 16 percent.

- Estimated share-based compensation: $94 million, net of tax, up 24 percent year-over-year and 7 percent sequentially.

- Operating cash flow: $739 million, down 25 percent year-over-year; 27 percent of revenues.

- Return of capital to stockholders: $261 million, or $0.16 per share, of cash dividends paid.

**Qualcomm Pro Forma Third Quarter Results**
Pro forma results exclude the Qualcomm Strategic Initiatives (QSI) segment, certain estimated share-based compensation, certain tax items related to prior years and acquired in-process research and development (R&D) expense.

- Revenues: $2.8 billion, up 19 percent year-over-year and 6 percent sequentially.

- Net income: $915 million, down 2 percent year-over-year and up 2 percent sequentially.

*-more-*

Exhibit 2, page 000035

- Diluted earnings per share: $0.55, even year-over-year and up 2 percent sequentially; excludes $0.04 loss per share attributable to the QSI segment, $0.06 loss per share attributable to certain estimated share-based compensation and $0.01 loss per share attributable to acquired in-process R&D. (The sum of pro forma earnings per share and items excluded do not equal total Qualcomm (GAAP) earnings per share due to rounding.)

- Effective tax rate: 18 percent for the quarter. Fiscal 2008 estimated tax rate of approximately 19 percent.

- Free cash flow: $844 million, down 14 percent year-over-year; 31 percent of revenues (defined as net cash from operating activities less capital expenditures).

Detailed reconciliations between total Qualcomm (GAAP) results and cash flow and Qualcomm pro forma results and cash flow are included at the end of this news release. Prior period reconciliations are presented on Qualcomm's Investor Relations web page at www.qualcomm.com.

"We are pleased to report another strong quarter as the migration to 3G-enabled products continues to accelerate," said Dr. Paul E. Jacobs, chief executive officer of Qualcomm. "We delivered record revenues, up 19 percent year-over-year, and our pro forma earnings per share were at the high end of our prior estimate.

"I am also pleased to announce that we have reached a settlement agreement with Nokia that resolves all litigation between the companies and will allow both of us to focus our efforts on driving the global 3G and 4G markets forward. In addition to providing an up-front royalty payment and other benefits, Qualcomm will also receive on-going royalties for all CDMA standards, as well as single-mode OFDMA. I look forward to providing our updated guidance tomorrow morning."

**Cash and Marketable Securities**

Qualcomm's cash, cash equivalents and marketable securities totaled approximately $11.2 billion at the end of the third quarter of fiscal 2008, compared to $10.6 billion at the end of the second quarter of fiscal 2008 and $12.3 billion a year ago. On July 16, 2008, we announced a cash dividend of $0.16 per share payable on September 26, 2008 to stockholders of record at the close of business on August 29, 2008.

Exhibit 2, page 000036

**Estimated Share-Based Compensation**

Total Qualcomm (GAAP) net income for the third quarter of fiscal 2008 included estimated share-based compensation, net of tax, of $94 million, or $0.06 per diluted share. This compares to $76 million, or $0.04 per diluted share, in the prior year quarter.

**Research and Development**

| ($ in millions) | Qualcomm Pro Forma | Estimated Share-Based Compensation | In-Process R&D | QSI | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|
| Third quarter fiscal 2008 | $ 495 | $ 64 | $ 13 | $ 24 | $ 596 |
| As a % of revenue | 18% | | | N/M | 22% |
| Third quarter fiscal 2007 | $ 385 | $ 50 | $— | $ 19 | $ 454 |
| As a % of revenue | 17% | | | | 20% |
| Year-over-year change ($) | 29% | 28% | | 26% | 31% |

N/M — Not Meaningful

Pro forma R&D expenses increased 29 percent year-over-year, primarily due to an increase in costs related to the development of integrated circuit products, next-generation CDMA and OFDMA technologies, the expansion of our intellectual property portfolio and other initiatives to support the acceleration of advanced wireless products and services, including lower-cost devices, the integration of wireless technologies with consumer electronics and computing, the convergence of multiband, multimode, multinetwork products and technologies, third-party operating systems and services platforms. QSI R&D expenses were related to MediaFLO USA.

**Selling, General and Administrative**

| ($ in millions) | Qualcomm Pro Forma | Estimated Share-Based Compensation | QSI | Total Qualcomm (GAAP) |
|---|---|---|---|---|
| Third quarter fiscal 2008 | $ 357 | $ 65 | $ 31 | $ 453 |
| As a % of revenue | 13% | | N/M | 16% |
| Third quarter fiscal 2007 | $ 307 | $ 54 | $ 40 | $ 401 |
| As a % of revenue | 13% | | | 17% |
| Year-over-year change ($) | 16% | 20% | (23%) | 13% |

Exhibit 2, page 000037

Pro forma selling, general and administrative (SG&A) expenses increased 16 percent year-over-year, primarily attributable to an increase in certain professional fees, primarily related to patent activities, and employee-related expenses. QSI SG&A expenses were primarily related to MediaFLO USA.

**Effective Income Tax Rate**
Without the potential effect of our settlement with Nokia, our fiscal 2008 effective income tax rates are estimated to be 16 percent for total Qualcomm (GAAP) and 19 percent for Qualcomm pro forma. The third quarter total Qualcomm (GAAP) and Qualcomm pro forma effective tax rates of 15 percent and 18 percent, respectively, are lower than the estimated annual effective tax rates primarily due to the change in our estimate of foreign earnings taxed at less than the United States federal tax rate.

**Qualcomm Strategic Initiatives**
The QSI segment includes our strategic investments, including our MediaFLO USA subsidiary, and related income and expenses. Total Qualcomm (GAAP) results for the third quarter of fiscal 2008 included a $0.04 loss per share for the QSI segment. The third quarter of fiscal 2008 QSI results included $88 million in operating expenses, primarily related to MediaFLO USA.

**Results of Business Segments** (in millions, except per share data):

**Third Quarter - Fiscal Year 2008**

| Segments | QCT | QTL | QWI | Reconciling Items (1) | Qualcomm Pro Forma | Estimated Share-Based Compensation (2) | In-Process R&D | QSI (3) | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|---|---|---|---|
| Revenues | $1,762 | $803 | $190 | $3 | $2,758 | $ — | $ — | $4 | $2,762 |
| Change from prior year | 29% | 5% | (3%) | N/M | 19% | | | N/M | 19% |
| Change from prior quarter | 9% | 1% | (2%) | N/M | 6% | | | 100% | 6% |
| EBT | $487 | $670 | $(1) | $(40) | $1,116 | $(139) | $(13) | $(82) | $882 |
| Change from prior year | 11% | 0% | N/M | N/M | (5%) | (22%) | N/A | 10% | (9%) |
| Change from prior quarter | 14% | (2%) | N/M | N/M | 2% | (7%) | N/A | (30%) | (3%) |
| EBT as a % of revenues | 28% | 83% | (1%) | N/M | 40% | N/A | N/A | N/M | 32% |
| Net income (loss) | | | | | $ 915 | $ (94) | $ (13) | $ (60) | $ 748 |
| Change from prior year | | | | | (2%) | (25%) | N/A | 2% | (6%) |
| Change from prior quarter | | | | | 2% | (7%) | N/A | (50%) | (2%) |
| Diluted EPS | | | | | $ 0.55 | $ (0.06) | $(0.01) | $(0.04) | $ 0.45 |
| Change from prior year | | | | | 0% | (50%) | N/A | 0% | (4%) |
| Change from prior quarter | | | | | 2% | (20%) | N/A | (100%) | (4%) |
| Diluted shares used | | | | | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 |

**Second Quarter - Fiscal Year 2008**

| Segments | QCT | QTL | QWI | Reconciling Items (1) | Qualcomm Pro Forma | Estimated Share-Based Compensation (2) | QSI (3) | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|---|---|---|
| Revenues | $1,620 | $ 795 | $ 194 | $ (5) | $2,604 | $ — | $ 2 | $2,606 |
| EBT | 427 | 684 | | (12) | 1,099 | (130) | (63) | 906 |
| Net income (loss) | | | | | 894 | (88) | (40) | 766 |
| Diluted EPS | | | | | $ 0.54 | $ (0.05) | $ (0.02) | $ 0.47 |
| Diluted shares used | | | | | 1,643 | 1,643 | 1,643 | 1,643 |

**Third Quarter - Fiscal Year 2007**

| Segments | QCT | QTL | QWI | Reconciling Items (1) | Qualcomm Pro Forma | Estimated Share-Based Compensation (2) | QSI (3) | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|---|---|---|
| Revenues | $1,367 | $ 766 | $ 196 | $ (4) | $2,325 | $ — | $ — | $2,325 |
| EBT | 439 | 668 | 18 | 52 | 1,177 | (114) | (91) | 972 |
| Net income (loss) | | | | | 934 | (75) | (61) | 798 |
| Diluted EPS | | | | | $ 0.55 | $ (0.04) | $ (0.04) | $ 0.47 |
| Diluted shares used | | | | | 1,704 | 1,704 | 1,704 | 1,704 |

**Fourth Quarter - Fiscal Year 2007**

| Segments | QCT | QTL | QWI | Reconciling Items (1) | Qualcomm Pro Forma | Estimated Share-Based Compensation (2) | Tax Items (4) | QSI (3) | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|---|---|---|---|
| Revenues | $1,419 | $ 647 | $ 245 | $ (6) | $2,305 | $ — | $ — | $ 1 | $2,306 |
| EBT | 424 | 537 | 31 | 137 | 1,129 | (117) | | (64) | 948 |
| | | | | | 911 | (77) | 331 | (34) | 1,131 |

| | | | | | |
|---|---|---|---|---|---|
| Net income (loss) | | | | | |
| Diluted EPS | $ 0.54 | $ (0.05) | $ 0.20 | $ (0.02) | $ 0.67 |
| Diluted shares used | 1,689 | 1,689 | 1,689 | 1,689 | 1,689 |

**Twelve Months – Fiscal Year 2007**

| Segments | QCT | QTL | QWI | Reconciling Items (1) | Qualcomm Pro Forma | Estimated Share-Based Compensation (2) | Tax Items (4) | In-Process R&D | QSI | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $5,275 | $2,772 | $828 | $(5) | $8,870 | $ — | $ — | $ — | $ 1 | $8,871 |
| EBT | 1,547 | 2,340 | 88 | 388 | 4,363 | (487) | — | (10) | (240) | 3,626 |
| Net income (loss) | | | | | 3,406 | (321) | 364 | (9) | (137) | 3,303 |
| Diluted EPS | | | | | $ 2.01 | $ (0.19) | $ 0.22 | $ (0.01) | $ (0.08) | $ 1.95 |
| Diluted shares used | | | | | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 | 1,693 |

**Nine Months – Fiscal Year 2008**

| Segments | QCT | QTL | QWI | Reconciling Items (1) | Qualcomm Pro Forma | Estimated Share-Based Compensation (2) | In-Process R&D | QSI (3) | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|---|---|---|---|
| Revenues | $4,956 | $2,248 | $ 595 | $ 2 | $7,801 | $ — | $ — | $ 7 | $7,808 |
| Change from prior year | 29% | 6% | 2% | N/M | 19% | | N/M | | 19% |
| EBT | $1,383 | $1,895 | $ 23 | $ 25 | $3,326 | $ (394) | $ (14) | $ (200) | $2,718 |
| Change from prior year | 23% | 5% | (60%) | N/M | 3% | (6%) | (40%) | (14%) | 1% |
| Net income (loss) | | | | | $2,682 | $ (267) | $ (13) | $ (120) | $2,282 |
| Change from prior year | | | | | 8% | (9%) | (44%) | (17%) | 5% |
| Diluted EPS | | | | | $ 1.62 | $ (0.16) | $ (0.01) | $ (0.07) | $ 1.38 |
| Change from prior year | | | | | 10% | (14%) | 0% | (17%) | 8% |
| Diluted shares used | | | | | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 |

**Nine Months – Fiscal Year 2007**

| Segments | QCT | QTL | QWI | Reconciling Items (1) | Qualcomm Pro Forma | Estimated Share-Based Compensation (2) | Tax Items | In-Process R&D | QSI (3) | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $3,856 | $2,125 | $ 583 | $ 1 | $6,565 | $ — | $ — | $ — | | $6,565 |
| EBT | 1,123 | 1,803 | 58 | 250 | 3,234 | (370) | — | (10) | (176) | 2,678 |
| Net income (loss) | | | | | 2,494 | (244) | 33 | (9) | (103) | 2,171 |
| Diluted EPS | | | | | $ 1.47 | $ (0.14) | $ 0.02 | $ (0.01) | $ (0.06) | $ 1.28 |
| Diluted shares used | | | | | 1,694 | 1,694 | 1,694 | 1,694 | 1,694 | 1,694 |

Source: QUALCOMM INC/DE, 8-K, July 24, 2008

(1)   Reconciling items related to revenues consist primarily of other nonreportable segment revenues less intersegment eliminations. Reconciling items related to earnings before taxes consist primarily of certain investment income, research and development expenses and marketing expenses that are not allocated to the segments for management reporting purposes, nonreportable segment results and the elimination of intersegment profit.

(2)   Certain share-based compensation is included in operating expenses as part of employee-related costs but is not allocated to the Company's segments as such costs are not considered relevant by management in evaluating segment performance.

(3)   At fiscal year-end, the sum of the quarterly tax provisions for each column, including QSI, equals the annual tax provisions for each column computed in accordance with GAAP. In interim quarters, the tax provision for the QSI operating segment is computed by subtracting the tax provision for Qualcomm pro forma, the tax items column and the tax provisions related to estimated share-based compensation and in-process R&D from the tax provision for total Qualcomm (GAAP).

(4)   During the fourth quarter of fiscal 2007, the Company recorded a $331 million tax benefit, or $0.20 diluted earnings per share, related to tax expense recorded in prior years resulting from the completion of tax audits during the fourth fiscal quarter. The fiscal 2007 Qualcomm pro forma results excluded this tax benefit attributable to prior years.

N/M — Not Meaningful

N/A — Not Applicable

Sums may not equal totals due to rounding.

**Conference Call**
Qualcomm's third quarter fiscal 2008 earnings conference call will be broadcast live on July 24, 2008 beginning at 5:00 a.m. Pacific Daylight Time (PDT) on the Company's web site at: www.qualcomm.com. This conference call may contain forward-looking financial information. The conference call will include a discussion of "non-GAAP financial measures" as that term is defined in Regulation G. The most directly comparable GAAP financial measures and information reconciling these non-GAAP financial measures to the Company's financial results prepared in accordance with GAAP, as well as the other material financial and statistical information to be discussed in the conference call, will be posted on the Company's Investor Relations web site at www.qualcomm.com immediately prior to commencement of the call. A taped audio replay will be available via telephone on July 24, 2008, beginning at approximately 6:00 a.m. PDT through August 23, 2008 at 9:00 p.m. PDT. To listen to the replay, U.S. callers may dial (800) 642-1687 and international callers may dial (706) 645-9291. U.S. and international callers should use reservation number 57610454. An audio replay of the conference call will be available on the Company's web site at www.qualcomm.com for two weeks following the live call.

**Editor's Note: To view the web slides that accompany this earnings release and conference call, please go to the Qualcomm Investor Relations website at http://investor.qualcomm.com/results.cfm.**

Qualcomm Incorporated (www.qualcomm.com) is a leader in developing and delivering innovative digital wireless communications products and services based on CDMA and other advanced technologies. Headquartered in San Diego, Calif., Qualcomm is included in the S&P

500 Index and is a 2008 FORTUNE 500® company traded on The Nasdaq Stock Market® under the ticker symbol QCOM.

**Note Regarding Use of Non-GAAP Financial Measures**

The Company presents pro forma financial information that is used by management (i) to evaluate, assess and benchmark the Company's operating results on a consistent and comparable basis, (ii) to measure the performance and efficiency of the Company's ongoing core operating businesses, including the Qualcomm CDMA Technologies, Qualcomm Technology Licensing and Qualcomm Wireless & Internet segments and (iii) to compare the performance and efficiency of these segments against each other and against competitors outside the Company. Pro forma measurements of the following financial data are used by the Company's management: revenues, R&D expenses, SG&A expenses, total operating expenses, operating income, net investment income, income before income taxes, effective tax rate, net income, diluted earnings per share, operating cash flow and free cash flow. Management is able to assess what it believes is a more meaningful and comparable set of financial performance measures for the Company and its business segments by using pro forma information. As a result, management compensation decisions and the review of executive compensation by the Compensation Committee of the Board of Directors focus primarily on pro forma financial measures applicable to the Company and its business segments.

Pro forma information used by management excludes the QSI segment, certain estimated share-based compensation, certain tax items related to prior years and acquired in-process R&D. The QSI segment is excluded because the Company expects to exit its strategic investments at various times, and the effects of fluctuations in the value of such investments are viewed by management as unrelated to the Company's operational performance. Estimated share-based compensation, other than amounts related to share-based awards granted under a bonus program that may result in the issuance of unrestricted shares of the Company's common stock, is excluded because management views the valuation of options and other share-based compensation as theoretical and unrelated to the Company's operational performance. Further, share-based compensation is affected by factors that are subject to change, including the Company's stock price, stock market volatility, expected option life, risk-free interest rates and expected dividend payouts in future years. Moreover, it is generally not an expense that requires or will require cash payment by the

Exhibit 2, page 000042

Company. Certain tax items related to prior years are excluded in order to provide a clearer understanding of the Company's ongoing tax rate and after tax earnings. Acquired in-process R&D is excluded because such expense is viewed by management as unrelated to the operating activities of the Company's ongoing core businesses.

The Company presents free cash flow, defined as net cash provided by operating activities less capital expenditures, to facilitate an understanding of the amount of cash flow generated that is available to grow its business and to create long-term shareholder value. The Company believes that this presentation is useful in evaluating its operating performance and financial strength. In addition, management uses this measure to evaluate the Company's performance, to value the Company and to compare its operating performance with other companies in the industry.

The non-GAAP pro forma financial information presented herein should be considered in addition to, not as a substitute for, or superior to, financial measures calculated in accordance with GAAP. In addition, "pro forma" is not a term defined by GAAP, and, as a result, the Company's measure of pro forma results might be different than similarly titled measures used by other companies. Reconciliations between total Qualcomm (GAAP) results and Qualcomm pro forma results and between total Qualcomm (GAAP) cash flow and Qualcomm pro forma cash flow are presented herein.

**Note Regarding Forward-Looking Statements**
In addition to the historical information contained herein, this news release contains forward-looking statements that are subject to risks and uncertainties. Actual results may differ substantially from those referred to herein due to a number of factors, including but not limited to risks associated with: the rate of deployment of our technologies in wireless networks and of 3G wireless communications, equipment and services, including CDMA2000 1X, 1xEV-DO, WCDMA, HSPA and OFDMA both domestically and internationally; attacks on our business model, including results of current and future litigation and arbitration proceedings, as well as actions of governmental or quasi-governmental bodies, and the costs we incur in connection therewith, including potentially damaged relationships with customers and operators who may be impacted by the results of these proceedings; fluctuations in the demand for products, services or applications based on our technologies; our

dependence on major customers and licensees; foreign currency fluctuations; strategic loans, investments and transactions we have or may pursue; our dependence on third-party manufacturers and suppliers; our ability to maintain and improve operational efficiencies and profitability; the development, deployment and commercial acceptance of the MediaFLO USA network and FLO™ technology; as well as the other risks detailed from time-to-time in our SEC reports.

###

© 2008 Qualcomm Incorporated. All rights reserved. Qualcomm is a registered trademark of Qualcomm Incorporated. MediaFLO and FLO are trademarks of Qualcomm Incorporated. CDMA2000 is a registered trademark of the Telecommunications Industry Association. All other trademarks are the property of their respective owners.

**Qualcomm Incorporated**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**This schedule is to assist the reader in reconciling from Qualcomm**
**Pro Forma results to Total Qualcomm (GAAP) results**
**(In millions, except per share data)**
**(Unaudited)**

| | Three Months Ended June 29, 2008 | | | | |
|---|---|---|---|---|---|
| | Qualcomm Pro Forma | Estimated Share-Based Compensation | In-Process R&D | QSI | Total Qualcomm (GAAP) |
| Revenues: | | | | | |
| Equipment and services | $ 1,863 | $ — | $ — | $ 4 | $ 1,867 |
| Licensing and royalty fees | 895 | — | — | — | 895 |
| Total revenues | 2,758 | — | — | 4 | 2,762 |
| | | | | | |
| Operating expenses: | | | | | |
| Cost of equipment and services revenues | 846 | 10 | — | 33 | 889 |
| Research and development | 495 | 64 | 13 | 24 | 596 |
| Selling, general and administrative | 357 | 65 | — | 31 | 453 |
| Total operating expenses | 1,698 | 139 | 13 | 88 | 1,938 |
| | | | | | |
| Operating income (loss) | 1,060 | (139) | (13) | (84) | 824 |
| | | | | | |
| Investment income, net | 56(a) | — | — | 2(b) | 58 |
| Income (loss) before income taxes | 1,116 | (139) | (13) | (82) | 882 |
| Income tax (expense) benefit | (201)(c) | 45 | — | 22(d) | (134)(c) |
| Net income (loss) | $ 915 | $ (94) | $ (13) | $ (60) | $ 748 |
| | | | | | |
| Earnings (loss) per common share: | | | | | |
| Diluted | $ 0.55 | $ (0.06) | $ (0.01) | $ (0.04) | $ 0.45 |
| | | | | | |
| Shares used in per share calculations: | | | | | |
| Diluted | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 |
| | | | | | |
| **Supplemental Financial Data:** | | | | | |
| Operating Cash Flow | $ 1,020 | $ (209)(f) | $ (13) | $ (59) | $ 739 |
| Operating Cash Flow as a % of Revenues | 37% | | | N/M | 27% |
| Free Cash Flow (e) | $ 844 | $ (209)(f) | $ (13) | $ (438) | $ 184 |
| Free Cash Flow as a % of Revenues | 31% | | | N/M | 7% |

(a)  Included $105 million in interest and dividend income related to cash, cash equivalents and marketable securities, which were not part of the Company's strategic investment portfolio, and $24 million in net realized gains on investments, partially offset by $71 million in other-than-temporary losses on investments and $2 million in interest expense.

(b)  Included $15 million in net realized gains on investments and $3 million interest and dividend income, partially offset by $12 million in other-than-temporary losses on investments, $2 million in equity in losses of investees and $2 million in interest expense.

(c)  The third quarter of fiscal 2008 effective tax rates were approximately 15% for total Qualcomm (GAAP) and approximately 18% for Qualcomm pro forma.

(d)  At fiscal year-end, the sum of the quarterly tax provisions for each column, including QSI, equals the annual tax provisions for each column computed in accordance with GAAP. In interim quarters, the tax provision for the QSI operating segment is computed by subtracting the tax provision for Qualcomm pro forma, the tax items column and the tax provisions related to estimated share-based compensation and in-process R&D from the tax provision for total Qualcomm (GAAP).

(e)  Free Cash Flow is calculated as net cash provided by operating activities less capital expenditures. Reconciliation of these amounts is included in the Reconciliation of Pro Forma Free Cash Flows to Total Qualcomm (GAAP) net cash provided by operating activities and other supplemental disclosures for the three months ended June 29, 2008, included herein.

Exhibit 2, page 000045

(f)    Incremental tax benefits from stock options exercised during the period.

Exhibit 2, page 000046

**Qualcomm Incorporated**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**This schedule is to assist the reader in reconciling from Qualcomm**
**Pro Forma results to Total Qualcomm (GAAP) results**
**(In millions, except per share data)**
**(Unaudited)**

| | Nine Months Ended June 29, 2008 | | | | |
|---|---|---|---|---|---|
| | Qualcomm Pro Forma | Estimated Share-Based Compensation (a) | In-Process R&D | QSI | Total Qualcomm (GAAP) |
| Revenues: | | | | | |
| Equipment and services | $ 5,288 | $ — | $ — | $ 7 | $ 5,295 |
| Licensing and royalty fees | 2,513 | — | | | 2,513 |
| Total revenues | 7,801 | — | | 7 | 7,808 |
| | | | | | |
| Operating expenses: | | | | | |
| Cost of equipment and services revenues | 2,379 | 29 | — | 85 | 2,493 |
| Research and development | 1,397 | 182 | 14 | 67 | 1,660 |
| Selling, general and administrative | 1,000 | 183 | — | 78 | 1,261 |
| Total operating expenses | 4,776 | 394 | 14 | 230 | 5,414 |
| | | | | | |
| Operating income (loss) | 3,025 | (394) | (14) | (223) | 2,394 |
| | | | | | |
| Investment income, net | 301(b) | | | 23(c) | 324 |
| Income (loss) before income taxes | 3,326 | (394) | (14) | (200) | 2,718 |
| Income tax (expense) benefit | (644)(d) | 127 | 1 | 80(e) | (436)(d) |
| Net income (loss) | $ 2,682 | $ (267) | $ (13) | $ (120) | $ 2,282 |
| | | | | | |
| Earnings (loss) per common share: | | | | | |
| Diluted | $ 1.62 | $ (0.16) | $ (0.01) | $ (0.07) | $ 1.38 |
| | | | | | |
| Shares used in per share calculations: | | | | | |
| Diluted | 1,654 | 1,654 | 1,654 | 1,654 | 1,654 |
| | | | | | |
| **Supplemental Financial Data:** | | | | | |
| Operating Cash Flow | $ 3,090 | $ (310)(g) | $ (14) | $ (199) | $ 2,567 |
| Operating Cash Flow as a % of Revenue | 40% | | | N/M | 33% |
| Free Cash Flow (f) | $ 2,722 | $ (310)(g) | $ (14) | $ (814) | $ 1,584 |
| Free Cash Flow as a % of Revenue | 35% | | | N/M | 20% |

(a)  Estimated share-based compensation presented above and excluded from pro forma results did not include $1 million, net of tax, related to share-based awards granted under a bonus program.

(b)  Included $374 million in interest and dividend income related to cash, cash equivalents and marketable securities, which were not part of the Company's strategic investment portfolio, $108 million in net realized gains on investments and $6 million in gains on derivative instruments from put options related to our share repurchase program, partially offset by $175 million in other-than-temporary losses on investments and $12 million in interest expense.

(c)  Included $50 million in net realized gains on investments, $4 million in interest and dividend income and $1 million in equity in earnings of investees, partially offset by $27 million in other-than-temporary losses on investments and $5 million in interest expense.

(d)  The effective tax rates for the nine months ended June 29, 2008 were approximately 16% for total Qualcomm (GAAP) and approximately 19% for Qualcomm pro forma.

(e)  At fiscal year-end, the sum of the quarterly tax provisions for each column, including QSI, equals the annual tax provisions for each column computed in accordance with GAAP. In interim quarters, the tax provision for the QSI operating segment is computed by subtracting the tax provision for Qualcomm pro forma, the tax items column and the tax provisions related to estimated share-based compensation and in-process R&D from the tax provision for total Qualcomm (GAAP).

Source: QUALCOMM INC/DE, 8-K, July 24, 2008

Exhibit 2, page 000047

(f)   Free Cash Flow is calculated as net cash provided by operating activities less capital expenditures. Reconciliation of these amounts is included in the Reconciliation of Pro Forma Free Cash Flows to Total Qualcomm (GAAP) net cash provided by operating activities and other supplemental disclosures for the nine months ended June 29, 2008, included herein.

(g)   Incremental tax benefits from stock options exercised during the period.

Exhibit 2, page 000048

*Qualcomm Announces Third Quarter Fiscal 2008 Results*                                        *Page 12 of 15*

**Qualcomm Incorporated**
**Reconciliation of Pro Forma Free Cash Flows to**
**Total Qualcomm (GAAP) net cash provided by operating activities**
**and other supplemental disclosures**
**(In millions)**
**(Unaudited)**

| | Three Months Ended June 29, 2008 | | | | |
| | Qualcomm Pro Forma | Estimated Share-Based Compensation | In-Process R&D | QSI | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ 1,020 | $ (209)(a) | $ (13) | $ (59) | $ 739 |
| Less: capital expenditures | (176) | — | — | (379) | (555) |
| **Free cash flow** | $ 844 | $ (209) | $ (13) | $ (438) | $ 184 |
| | | | | | |
| Other supplemental cash disclosures: | | | | | |
| Cash transfers from QSI (1) | $ 30 | $ — | $ — | $ (30) | $ — |
| Cash transfers to QSI (2) | (446) | — | — | 446 | — |
| Net cash transfers | $ (416) | $ — | $ — | $ 416 | $ — |

| | Nine Months Ended June 29, 2008 | | | | |
| | Qualcomm Pro Forma | Estimated Share-Based Compensation | In-Process R&D | QSI | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ 3,090 | $ (310)(a) | $ (14) | $ (199) | $ 2,567 |
| Less: capital expenditures (3) | (368) | — | — | (615) | (983) |
| **Free cash flow** | $ 2,722 | $ (310) | $ (14) | $ (814) | $ 1,584 |
| | | | | | |
| Other supplemental cash disclosures: | | | | | |
| Cash transfers from QSI (1) | $ 59 | $ — | $ — | $ (59) | $ — |
| Cash transfers to QSI (2) | (842) | — | — | 842 | — |
| Net cash transfers | $ (783) | $ — | $ — | $ 783 | $ — |

(1)  Cash from sale of equity securities.
(2)  Funding for strategic debt and equity investments, capital expenditures and other QSI operating expenses.
(3)  Upon receipt of licenses from the FCC for additional 700 MHz spectrum for use in our MediaFLO USA business, the deposit made in the second quarter of fiscal 2008 of $195 million was reclassified from Qualcomm pro forma capital expenditures to QSI capital expenditures. The total license fee included in QSI capital expenditures for fiscal 2008 was $555 million.

| | Three Months Ended July 1, 2007 | | | |
| | Qualcomm Pro Forma | Estimated Share-Based Compensation | QSI | Total Qualcomm (GAAP) |
|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ 1,122 | $ (80)(a) | $ (54) | $ 988 |
| Less: capital expenditures | (145) | — | (12) | (157) |
| **Free cash flow** | $ 977 | $ (80) | $ (66) | $ 831 |

| | Nine Months Ended July 1, 2007 | | | | |
| | Qualcomm Pro Forma | Estimated Share-Based Compensation | In-Process R&D | QSI | Total Qualcomm (GAAP) |
|---|---|---|---|---|---|
| Net cash provided (used) by operating activities | $ 3,116 | $ (199)(a) | $ (10) | $ (139) | $ 2,768 |
| Less: capital expenditures | (506) | — | — | (65) | (571) |
| **Free cash flow** | $ 2,610 | $ (199) | $ (10) | $ (204) | $ 2,197 |

Exhibit 2, page 000049

(a)   Incremental tax benefits from stock options exercised during the period.

Source: QUALCOMM INC/DE, 8-K, July 24, 2008

Exhibit 2, page 000050

**Qualcomm Incorporated**
## CONDENSED CONSOLIDATED BALANCE SHEETS
**(In millions, except per share data)**
**(Unaudited)**
### ASSETS

| | June 29, 2008 | September 30, 2007 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $   2,970 | $   2,411 |
| Marketable securities | 3,644 | 4,170 |
| Accounts receivable, net | 917 | 715 |
| Inventories | 618 | 469 |
| Deferred tax assets | 358 | 435 |
| Collateral held under securities lending | 326 | 421 |
| Other current assets | 228 | 200 |
| Total current assets | 9,061 | 8,821 |
| Marketable securities | 4,567 | 5,234 |
| Property, plant and equipment, net | 1,912 | 1,788 |
| Goodwill | 1,520 | 1,325 |
| Deferred tax assets | 870 | 318 |
| Other assets | 1,667 | 1,009 |
| Total assets | $  19,597 | $  18,495 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | June 29, 2008 | September 30, 2007 |
|---|---|---|
| Current liabilities: | | |
| Trade accounts payable | $   653 | $   635 |
| Payroll and other benefits related liabilities | 356 | 311 |
| Unearned revenues | 186 | 218 |
| Income taxes payable | 15 | 119 |
| Obligations under securities lending | 326 | 421 |
| Other current liabilities | 575 | 554 |
| Total current liabilities | 2,111 | 2,258 |
| Unearned revenues | 124 | 142 |
| Income taxes payable | 222 | — |
| Other liabilities | 314 | 260 |
| Total liabilities | 2,771 | 2,660 |
| Stockholders' equity: | | |
| Preferred stock, $0.0001 par value; issuable in series; 8 shares authorized; none outstanding at June 29, 2008 and September 30, 2007 | — | — |
| Common stock, $0.0001 par value; 6,000 shares authorized; 1,640 and 1,646 shares issued and outstanding at June 29, 2008 and September 30, 2007, respectively | — | — |
| Paid-in capital | 6,783 | 7,057 |
| Retained earnings | 10,104 | 8,541 |
| Accumulated other comprehensive (loss) income | (61) | 237 |
| Total stockholders' equity | 16,826 | 15,835 |
| Total liabilities and stockholders' equity | $  19,597 | $  18,495 |

**Qualcomm Incorporated**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except per share data)**
**(Unaudited)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | June 29, 2008 | July 1, 2007 | June 29, 2008 | July 1, 2007 |
| Revenues: | | | | |
| Equipment and services | $ 1,867 | $ 1,484 | $ 5,295 | $ 4,196 |
| Licensing and royalty fees | 895 | 841 | 2,513 | 2,369 |
| Total revenues | 2,762 | 2,325 | 7,808 | 6,565 |
| Operating expenses: | | | | |
| Cost of equipment and services revenues | 889 | 688 | 2,493 | 1,956 |
| Research and development | 596 | 454 | 1,660 | 1,348 |
| Selling, general and administrative | 453 | 401 | 1,261 | 1,155 |
| Total operating expenses | 1,938 | 1,543 | 5,414 | 4,459 |
| Operating income | 824 | 782 | 2,394 | 2,106 |
| Investment income, net | 58 | 190 | 324 | 572 |
| Income before income taxes | 882 | 972 | 2,718 | 2,678 |
| Income tax expense | (134) | (174) | (436) | (507) |
| Net income | $ 748 | $ 798 | $ 2,282 | $ 2,171 |
| Basic earnings per common share | $ 0.46 | $ 0.48 | $ 1.40 | $ 1.31 |
| Diluted earnings per common share | $ 0.45 | $ 0.47 | $ 1.38 | $ 1.28 |
| Shares used in per share calculations: | | | | |
| Basic | 1,626 | 1,670 | 1,626 | 1,661 |
| Diluted | 1,654 | 1,704 | 1,654 | 1,694 |
| Dividends per share paid | $ 0.16 | $ 0.14 | $ 0.44 | $ 0.38 |
| Dividends per share announced | $ 0.16 | $ 0.14 | $ 0.44 | $ 0.38 |

**Qualcomm Incorporated**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**
**(Unaudited)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | June 29, 2008 | July 1, 2007 | June 29, 2008 | July 1, 2007 |
| **Operating Activities:** | | | | |
| Net income | $ 748 | $ 798 | $ 2,282 | $ 2,171 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation and amortization | 117 | 99 | 336 | 283 |
| Non-cash income tax expense | 66 | 136 | 148 | 365 |
| Non-cash portion of share-based compensation expense | 138 | 114 | 393 | 371 |
| Incremental tax benefits from stock options exercised | (209) | (80) | (310) | (199) |
| Net realized gains on marketable securities and other investments | (39) | (53) | (158) | (173) |
| Other-than-temporary losses on marketable securities and other investments | 83 | 8 | 202 | 11 |
| Other items, net | 11 | 7 | 1 | 5 |
| Changes in assets and liabilities, net of effects of acquisitions: | | | | |
| Accounts receivable, net | (186) | (45) | (178) | (62) |
| Inventories | (7) | (49) | (142) | (147) |
| Other assets | (7) | 10 | 35 | (137) |
| Trade accounts payable | (24) | (7) | (4) | 127 |
| Payroll, benefits and other liabilities | 78 | 68 | 12 | 69 |
| Unearned revenues | (30) | (18) | (50) | 84 |
| Net cash provided by operating activities | 739 | 988 | 2,567 | 2,768 |
| **Investing Activities:** | | | | |
| Capital expenditures | (555) | (157) | (983) | (571) |
| Purchases of available-for-sale securities | (1,984) | (2,340) | (4,944) | (5,921) |
| Proceeds from sale of available-for-sale securities | 1,559 | 1,909 | 5,548 | 6,254 |
| Other investments and acquisitions, net of cash acquired | (8) | (3) | (283) | (230) |
| Change in collateral held under securities lending | 8 | (153) | 95 | (153) |
| Other items, net | 4 | 12 | 30 | 13 |
| Net cash used by investing activities | (976) | (732) | (537) | (608) |
| **Financing Activities:** | | | | |
| Proceeds from issuance of common stock | 464 | 220 | 700 | 474 |
| Incremental tax benefits from stock options exercised | 209 | 80 | 310 | 199 |
| Dividends paid | (261) | (234) | (716) | (632) |
| Repurchase and retirement of common stock | — | (129) | (1,670) | (264) |
| Proceeds from put options | — | 17 | — | 17 |
| Change in obligations under securities lending | (8) | 153 | (95) | 153 |
| Net cash provided (used) by financing activities | 404 | 107 | (1,471) | (53) |
| Effect of exchange rate changes on cash | — | — | — | 2 |
| **Net increase in cash and cash equivalents** | 167 | 363 | 559 | 2,109 |
| **Cash and cash equivalents at beginning of period** | 2,803 | 3,353 | 2,411 | 1,607 |
| **Cash and cash equivalents at end of period** | $ 2,970 | $ 3,716 | $ 2,970 | $ 3,716 |

Created by 10KWizard   www.10KWizard.com

Seeking Alpha

# Seeking Alpha $^{\alpha}$

# QUALCOMM Inc. F3Q08 (Qtr End 07/24/08) Earnings Call Transcript

July 24, 2008 | about: QCOM

QUALCOMM Inc. (QCOM)

F3Q08 (Qtr End 07/29/08) Earnings Call

July 24, 2008 8:00 am ET

**Executives**

John Gilbert - VP, Investor and Industry Analyst Relations

Paul Jacobs - CEO

Steven Altman - President

Sanjay Jha - COO

Bill Keitel - EVP and CFO

**Analysts**

Brian Modoff - Deutsche Bank

Mike Walkley - Piper Jaffray

Tim Luke - Lehman Brothers

Tal Liani - Merrill Lynch

Tim Long - Banc of America

Dona Jackson - Goldman Sachs

Ehud Gelblum - JPMorgan

Glenn Young - Citigroup

Mark Mckechnie - American Technology

James Faucette - Pacific Crest

Exhibit 3, page 000054

Kulbinder Garcha - Credit Suisse

Richard Windsor - Nomura

Brett Simpson - Arete

Maynard Um - UBS

**Presentation**

**Operator**

Ladies and gentlemen, thank you for standing by. Welcome to the QUALCOMM third quarter fiscal 2008 conference call. At this time all participants are in a listen-only mode. Later, we will conduct a question-and-answer session. (Operator Instructions). As a reminder this conference is being recorded July 24, 2008. The playback number for today's call is 1-800-642-1687, international callers please dial 1-706-645-9291. The playback reservation number is 57610454.

I would now like to turn the call over to Mr. John Gilbert, Vice President of Investor and Industry Analyst Relations.

Mr. Gilbert, please go ahead sir.

**John Gilbert**

Thank you and good morning. Today's call will include prepared remarks by Dr. Paul Jacobs, Steve Altman, Dr. Sanjay Jha and Bill Keitel. Don Rosenberg will also join the question-and-answer session. Due to previously scheduled business travels several of our executives are offsite and will be dialing in today's call.

An internet presentation and audio broadcast accompanies this call and you can access it by visiting www.qualcomm.com. During this conference call, if we use any non-GAAP financial measures as defined by the SEC and Regulation G, you can find the required reconciliations to GAAP on our website.

I would also direct you to our earnings release which was provided yesterday and furnished with the SEC today, as well as our guidance announcement released this morning, both of which are available on our website.

We may make forward-looking statements relating to our expectations and other future events that may differ materially from QUALCOMM 's actual results. Please review our SEC filings for a detailed presentation of each of our businesses and associated risks and other important factors that may cause our actual results to differ from these forward-looking statements.

And now it is my pleasure to introduce QUALCOMM 's CEO, Dr. Paul Jacobs.

**Paul Jacobs**

Thank you John and good morning everyone. Sorry about the confusion on the earnings call yesterday. We are obviously hoping to get the earnings release and various press release to you earlier, but I suspect that everyone on the call now understands why we were delayed, which was we reached a settlement agreement with Nokia, and that we're quite pleased with the deal.

Now we're still assessing the accounting treatment of the settlement. As usual we'll give you our best view today, and we'll update you as we progress through the quarter if there are any significant changes. This settlement was the result of a tremendous amount of effort by a large team of people, including internal and external counsel and I'd very much like to thank.

There are many positive aspects of this settlement agreement; and Steve Altman will cover those details later in the call. Unfortunately we are constrained by a confidentiality agreement with Nokia which does limit the amount that we can currently disclose regarding the specific terms of the deal.

Turning to the business, just wanted to start by saying we have added two senior leaders from our QCT business. Jim

Exhibit 3, page 000055

Lederer and Steve Mollenkopf to our Executive Committee. Jim and Steve have played critical roles in QCT's success and we all look forward to their continued contributions serving on the executive committee.

I'd like to now highlight our third quarter financial results. Another strong quarter of 3G adoption, including another record quarter of MSM shipments enabled us to again deliver excellent results to our stockholders. We delivered record revenues up 19% year-over-year and pro-forma earnings per share were at the high end of our prior estimates. It's also important to include to remember that this year's result does not include the Nokia royalties.

Worldwide demand for 3G continues at a rapid pace and for calendar year 2008, we continued to see approximately 30% year-over-year growth for CDMA based device shipments. The fundamental drivers of our business remain strong, raising our fiscal 2008 revenue and earnings per share estimate.

There are many exciting developments in our business and I'd like to now highlight some of the key achievements. QCT delivered its 12th consecutive quarterly record for MSM shipments as shipment volumes as shipments of CDMA based chipsets were up 32% year-over-year, QCT continues its leadership position in execution and innovation, providing a competitive advantage to our partners by delivering the highest quality most advanced products and services in the marketplace.

Sanjay will provide you with more details later in the call. Our licensing business continues to fuel innovation competition and growth. Consumers benefit from the significant number of device options ranging from feature-rich smart phones to entry level handsets. The expanded worldwide marketplace enabled by our broad licensing program continues to drive down the price of CDMA based devices.

For example, according to reports from our licensees, the lowest priced WCDMA handset sold in quantities of more than 50,000 in the March quarter were less than $70, a 50% reduction from the year ago quarter. We are also continuing to see low-end CMDA2000 handset at $20 price point.

Building on our collaborative efforts to bring compelling solutions to market at our BREW conference in May, we announced our BREW mobile platform. This platform integrates Adobe Flash technology; it will help accelerate the development of rich flash based application user interfaces and the internet content in mass-market devices.

Additionally, we announced Plaza, an integrated wireless service platform with a common framework for the development and support of widget, that will allow operators and developers to produce and distribute internet based content across all networks and devices quickly and easily.

Our MediaFLO USA business reached another key milestone this past quarter when AT&T launched AT&T Mobile TV service using FLO. We are very pleased that both Verizon and AT&T have commercially launched the FLO TV service providing more consumers with the opportunity to enjoy mobile television.

We've now aired more than 3000 hours of sports and over 1000 events, including 5 days of U.S. Open Golf coverage and over 100 hours from Wimbledon. We continue to execute with our content partners to bring world class programming to Mobile TV subscribers including recently announced coverage of the upcoming X Games and complete coverage of the 2008 Olympics games in Beijing.

Internationally our MediaFLO Technologies team is working on opportunities in Europe, Asia and Latin America. We recently demonstrated the capability to support MediaFLO and the ISDB-T Mobile TV Standards on a multiple-mode handset using our universal-broadcast modem chip.

The universal-broadcast modem supports three of the worlds leading Mobile TV Standards in one chipset providing device manufacturers and operators the flexibility to drive Mobile TV adoption. We are honored to be elected to the Broadcast Mobile Conversions Forums Governing Board.

We share the forums views on fostering innovation in a technology neutral market environment for promoting Mobile Broadcast services. Our QUALCOMM 's MEMS technology division reached an important milestone this past quarter, when they demonstrated the first iMod color mirasol display, marking another step towards bringing mirasol displays into mainstream mobile devices.

Together with Foxlink, we announced our plans to bring a new dedicated fabrication plant to manufacture our next generation mirasol displays, providing us the ability to deliver a wider variety of products in a more flexible and cost efficient manner.

Exhibit 3, page 000056

The worldwide 3G market continues to grow rapidly driven by increasing demand for mobile broadband services. Network operators continue to build-out their advanced 3G network to support this demand, as well as future innovative applications and services Data points from the CDG and GSA indicate that approximately 480 CDMA based 3G networks have been launched as of June 2008, including more than 95 operators deploying the higher speed of one 1xEV-DO and over 40 operators that have deployed EV-DO Revision A.

In addition, more than 205 operators have launched high speed HSDPA networks and more than 50 operators have deployed HSUPA. A wide variety of competitively priced feature rich devices continues to expand. Our partners have introduced exciting new devices with innovative features such as touch-screen, location-based services and Mobile TV.

According to the CDG and GSA over 500 1xEV-DO number 60 1xEV-DO Revision A devices have been introduced into the market and over 600 HSDPA devices and over 60 HSUPA devices have been launched.

Leveraging the broad 3G network coverage deployments and the wide range of devices in the market, operators continue to offer competitive data pricing plans, such as flat rate pricing and pre-paid data packages, further stimulating growth in this dynamic marketplace.

The latest subscriber numbers by wireless intelligence support this as worldwide 3G subscribers grew to approximately 670 million in June 2008, an increase of approximately 38% from the year ago quarter. In addition strategy analytics estimates that CDMA based handsets unit shipments grew 26% year-over-year compared to 14% growth across all technologies with just 10% growth for GSM.

Turning to some regional updates, in the United States, operators continue to generate significant revenues from their 3G data services. In the first quarter results Verizon Wireless said its data revenue grew nearly 49% year-over-year. Net wireless data revenue now represents 23% of total service revenues.

AT&T reported their wireless data revenues grew 52% in the year ago quarter and noted a strong year-over-year growth in several data services including wireless internet and multimedia messaging. Sprint noted its data revenues have grown 19% from the year ago quarter, net data revenues account for over 20% of the average revenue per subscriber.

In Europe based on our estimated device shipments for the quarter ending March 2008 WCDMA shipments increased approximately 38% year-over-year. Wireless intelligence reported that as of June end, WCDMA subscribers in Western Europe increased 92% year-over-year compared to a 5% year-over-year decline in GSM subscribers.

We continue to see the benefits of 3G networks in the results of our operator partners. Vodafone reported a 31% year-over-year increase in data revenues in Europe and noted that 3G devices have now reached 24% of their European customer base. O2 reported a 56% increase in non-messaging data revenues. Telefonica Spain reported a 56% increase in data connectivity revenues. In addition T-Mobile U.K. reported that data traffic had exceeded voice traffic for the first time.

Turning to Asia, solid growth in Korea is being driven by continued technology competition and the removal of the handset subsidy ban. Korean HSDPA subscribers continue to grow rapidly and now represent over 27% of total mobile subscribers. In Japan 3G subscribers as of June represent approximately 87% of the total cellular population.

3G adoption is robust in Southeast Asia as CDMA subscribers increased 84% from the year ago quarter. In another example of 3G benefiting our partners, Telstra recently commented that its 3G services are generating $20 more monthly revenue per customer as compared to their 3G services.

In China, we are looking forward to the completion of the telecom industry restructuring and the issuing of 3G licenses, which we anticipate will enable a very competitive marketplace. We continue to work closely with our partners in the industry to bring the benefits of CDMA based technologies to this market. Wile we are optimistic about the opportunities for 3G growth in China, we remain cautious on when 3G licenses will be awarded and continue to exclude them from our 2008 device forecast.

India remains one of the fastest growing wireless markets in the world, with CDMA2000 continuing to add more than 2 million net subscribers per month. CDMA2000 operators continue to differentiate themselves in the marketplace with compelling services including EV-DO from BSNL and TATA announcing its intent to deploy assisted GPS services. CDMA subscribers represent 26% of the total India wireless market.

WCDMA adoption in Latin America continues to grow as competition increases. According to operator announcements,

there are now 26 HSDPA networks launched, a 30% increase from our last quarter. So the mobile broadband market is as vibrant and competitive as ever, being driven by a vast number of industry participants, providing consumers compelling devices and services at affordable price point.

There are many opportunities ahead of us and we will continue to make significant investments in research and development to drive competition and expand 3G and next generation wireless technologies. That concludes my remarks and now what you've all have been waiting for I will turn the call over to Steve Altman to give you some details on the Nokia settlement. Thank you.

**Steven Altman**

Thanks Paul. As I am sure you saw in the press release issued last night, we are pleased to report that we have settled all of our litigation with Nokia, and that Nokia has agreed to withdraw its complaint to the EC.

In connection with the settlement we and Nokia have entered into a new 15-year agreement that continues until 2022. Under this new agreement, Nokia has been granted a license under all of our patents for use in their mobile devices and infrastructure equipment. In exchange not only will Nokia pay us a very substantial upfront payment, but through the term of this agreement it will also pay us ongoing royalties on all of its mobile devices that it sells, whether those devices are based on CDMA standards including WCDMA CDMA2000 and TD-SCDMA or whether their mobile devices are based on OFDMA standards including WiMax and LTE.

Nokia has also agreed not to assert any of its patents against us, enabling us to integrate Nokia's technology into our chipsets. In addition Nokia has agreed to assign ownership of a significant number of Nokia's patents to us, many of which Nokia has declared as being essential to OFDMA GSM and WCDMA.

Months ago, we announced that we have signed our first Tier 1 manufacturer to a royalty bearing license covering single mode OFDMA including LTE and WiMax subscriber equipment. We are very pleased to now have Nokia, the world's largest handset manufacturer sign up to a single mode OFDMA royalty bearing subscriber license as part of this new license agreement.

We believe that this demonstrates what we have publicly said regarding our OFDMA patent portfolio and its substantial value. I am delighted with this outcome. We believe that this is a very positive agreement for QUALCOMM and for Nokia and will open up opportunities for the companies work together in a number of areas.

Due to the confidentiality agreement with Nokia, we will not be able to provide any more details on the terms of these transactions. In a few minutes I'll turn the call over; actually right now I will turn the call over to Bill Keitel, who will give some color on the financial impact of these transactions and what they mean for QUALCOMM going forward. Thank you.

**Sanjay Jha**

Steve, this is Sanjay. I'll follow you and Bill will follow me. Good morning. QCT continued our track record of strong execution in the third quarter and I'd like to highlight the results. We shipped approximately 86 million chipsets which represent our 12th consecutive record quarter of shipment. This is 32% higher than the same quarter last year.

QCT generated revenues of $1.76 billion in third fiscal quarter of 2008. This was our 9th consecutive quarter of record revenue and represents a growth of 29% year-over-year. In the past few quarters, we have attributed our growth in shipment to entry-tier products destined for emerging market.

In the third quarter of fiscal 2008, an increase in demand for high speed data capable chipsets intended for advanced wireless devices drove our growth. EV-DO shipments increased 16% quarter-over-quarter and QCT's single chip EV-DO devices started to ship in volume quantities and contributed to the growth during the fiscal third quarter.

The QSC6075's unmatched level of integration, enables feature rich wireless devices to reach price points suitable for mass-market.

UMTS shipment increased 27% from fiscal second quarter. QCT shipment shipped a record quantity of the UMTS chipset last quarter and we believe we continue to gain market share in the UMTS chipset market. Our ASPs increased by 7.5% quarter-over-quarter due to product mix shift to a higher end. Demand for 7000-series convergence platform chipset increased as the market for both EV-DO and UMTS smart phones grew.

Exhibit 3, page 000058

QCT supports a full spectrum of low, medium and high tier smart phones with 7000-series family of chipset. We expect that stronger demand for these feature rich chipsets will continue in mature wireless markets and enable QCT to maintain flat to moderately lower weighted ASP going forward.

QCT delivered record operating profit of $487 million in fiscal third quarter, this represents a year-on-year increase of 11% and quarter-over-quarter increase of 14%. We are delivering record profits, while continuing our R&D investment which in turn enables our leading technology position relative to our competitor.

Looking forward, we are tracking some important market developments that are potentially significant. In China with China Telecom's commitment to CDMA2000, we anticipate upside for entry-tier products as carriers migrate subscriber from older less spectrally efficient technologies to CDMA2000.

Likewise, if the Chinese government issues 3G licensing guidelines, we expect a ramp in shipment of EV-DO and UMTS chipsets in china. Globally many UMTS carriers use HSPA+ and LTE evolution path as the more economical then alternative such as WiMax and we remain on track to support the carriers with our announced plan to trial HSPA+ in calendar 2008.

QCT has successfully sampled MDM8200, our first HSPA+ chipset and we are now making data calls of up to 20 megabits per second. We have begun inter-operatability testing with major 3G manufacture infrastructure vendors using MDM8200 based data card. This will be followed by testing with other major infrastructure vendors in coming week. Given that many key milestones have been achieved, we believe that first commercial HSPA+ system maybe deployed in late calendar 2008 or early 2009.

QCT also continues to invest for leadership in LTE, as we anticipate that it will be the predominant 4G technology selected by carriers worldwide. We remain on track to sample our multi-mode standard compliance 3G LTE chipset in second quarter of calendar 2009.

QCT is well positioned to address the growing demand from carriers, enterprise customers and notebook OEMs for mobile broadband solution. Currently data cards and USB modems satisfy most requirements in this market and QCT enjoys a strong position with these products.

We expect that demand will grow for embedded mobile broadband solution in calendar 2009 and QCT is well positioned with our Gobi offering. Momentum for Gobi remains strong as several additional carriers have certified the module for their network and the first laptops are shipping into the channels now.

QCT is engaged with more then 20 leading OEMs that are designing over 30 new devices based on our snapdragon and QST platforms. We expect QST enabled connected personal navigation devices to launch by the end of this calendar year, as preciously announced.

Thank you and I will now turn this call over to Bill Keitel for an overview of our financial results.

**Bill Keitel**

Thank you Sanjay and good morning everyone. I will begin with a couple of matters important to our results and forward guidance. First, our fiscal third quarter results do not include any impact related to the new Nokia agreement. We have provided a preliminary estimate of the earnings per share impact of the settlement agreement upon fiscal fourth quarter, and I will add this morning a preliminary estimate for fiscal 2009.

Second, we are reaffirming our guidance for strong year-over-year growth of CDMA based devices in 2008. Third, we are raising our estimates for fiscal 2008 revenue and earnings per share. The Nokia settlement agreement has increased our estimate, but it's noteworthy that our estimates have increased even without the new agreement.

Turning to our third fiscal quarter results, revenues were approximately $2.8 billion, a 19% increase year-over-year and pro-forma earnings per share were $0.55. In our QCT segment third quarter revenues increased 29% year-over-year and QCT's operating margin was 28%.

QTL earned record revenues of $803 million this quarter and we estimate approximately 107 million new CDMA devices were shipped in the March quarter, down sequentially and consistent with normal post holiday seasonality. The average selling price increased to approximately $226 per unit, reflecting stronger demand for full-featured devices as well as favorable currency impact.

Exhibit 3, page 000059

Case 3:09-cv-01565-JLS-WVG   Document 40   Filed 12/22/09   Page 60 of 71

CDMA based infrastructure royalties were also strong during the quarter, stemming from continued network upgrades by wireless operators and a good leading indicator for the future. QTL's operating margin was 83%. QWI revenues were $190 million with an operating loss of $1 million, primarily reflecting increased mobile banking investment.

Operating cash flow was approximately $739 million and pro-forma free cash flow was approximately $844 million or 31% of our revenues. During the quarter, we returned approximately $261 million of capital to our shareholders through a cash dividend, and we announced another cash dividend of $0.16 per share payable on September 26.

Cash and marketable securities totaled $11.2 billion with $6.7 billion offshore and $4.5 billion domestic. Our pro-forma estimated tax rate for fiscal 2008 is down 19% compared to our prior estimate of 20%.

Turning to our guidance; following a thorough refresh of our forecast for the calendar year 2008 CDMA market, we are reaffirming our estimates for 28% to 36% year-over-year growth in unit shipments. As many of you know, the majority of CDMA device shipments in any given year are replacement units; that is existing CDMA subscribers purchasing a new CDMA device.

At the outset of this year, we forecast an approximate 43% replacement rate for CDMA devices, down from approximately 47% in 2007. And we believe trends continue to support this forecast. The significant factor behind the replacement rate forecast is a good up tick on 3G data services and advanced 3G devices. We also see a continued conversion of subscribers from 2G to 3G.

Based on the 503 million midpoint of our estimate for calendar 2008, we anticipate shipments of approximately 229 million CDMA2000 units and approximately 274 million WCDMA units. The regional breakdown on this market estimate is available on our investor relations website.

As a reminder, we continue to exclude the increase from expected 3G licenses in China from our unit forecast. We are raising our estimates for fiscal 2008 revenues to between $10.3 billion and $10.5 billion, an increase of 16% to 18% over fiscal 2007 and excluding and as yet to be determined increment from the Nokia settlement agreement.

We estimate completing the definitive agreement with Nokia by the close of our fiscal fourth quarter would add approximately $0.07 to $0.13 per share to our fiscal 2008 earnings. This wide range reflects our preliminary estimate, as we are still working through some of the terms of the agreement, before we can make a final determination regarding the amount and timing of revenue recognition.

We are raising our estimates for fiscal 2008 pro forma earnings per share to $2.11 to $2.13, an increase of 5% to 6% year-over-year, again not including the $0.07 to $0.13 increment for Nokia. We now estimate the average selling price for CDMA2000 and WCDMA phones combined, were increased approximately 2% in fiscal 2008 to approximately $219 per unit. This estimate is slightly above our prior expectations and reflects increased demand for higher priced feature-rich devices.

We expect the combination of pro forma R&D and SG&A expense for fiscal 2008, to increase approximately 23% year-over-year, driven by continued QCT investment in new chipset products and capabilities, business model defense costs, as well as expenses for increased patent applications including the large quantity of OFDM inventions and innovations.

Turning to our guidance for the fourth quarter of fiscal 2008; we estimate pro forma earning per share to be approximately $0.49 to $0.51. Again completing the definitive agreement with Nokia by the close of the fiscal fourth quarter would add approximately $0.07 to $0.13 to this estimate.

Our fourth quarter guidance assumes shipments of approximately 84 million to 87 million MSM chipsets, a year-over-year increase of 24% to 28%. We estimate that approximately 114 million to 118 million CDMA-based devices shipped in the June quarter, an increase to 28% to 33% compared to the same period last year. We estimate the average selling price will be approximately $215 for the quarter.

We expect the combination of pro forma R&D and SG&A expenses to grow approximately 5% as compared to the June quarter. We believe total CDMA channel inventories are towards the high end of the historically normal band of 15 to 20 weeks and our forecast assumes that this will decrease in the coming quarter.

I thought it would be helpful to walk you through a summary earnings change analysis comparing fiscal 2007 fourth quarter to fiscal 2008 fourth quarter guidance. Te $0.50 earnings per share midpoint for our fourth quarter pro forma

Exhibit 3, page 000060

guidance again excluding the potential impact from the Nokia deal is a $0.04 decrease as compared to the year-ago quarter.

Year-over-year we expect QTL and QCT combined to be approximately $0.05 earnings per share higher due to greater unit volumes in both businesses, offset somewhat by pricing. And we estimate the QWI segment will be lower by approximately $0.02 per share.

Investment income is anticipated to be down year-over-year by approximately $0.05 a share and if you recall the fourth quarter of fiscal 2007 included a $0.02 gain from the sale of [buildings].

Looking forward to fiscal 2009, our initial estimate is that the Nokia deal will contribute approximately $0.20 to $0.28 per share, again subject to the definitive agreement which will in turn help us to find timing of revenue recognition. In closing, we are pleased to see the 3G migration around the world continue to accelerate, supported by the many innovative products and services that our business has help enable.

That concludes my comments and I'll now turn the call back to John Gilbert.

**John Gilbert**

Thank you, Bill. Before we go into our question-and-answer session I would like to remind our participants that our goal is to address as many questions as possible before we run out of time on the call. Please limit your questions to one per caller.

Operator we are ready for questions.

**Operator**

(Operator Instructions). Brian Modoff with Deutsche Bank, please go ahead with your question.

**Brian Modoff - Deutsche Bank**

Hi, congratulations on the agreement with Nokia it's good to see. Sanjay, question for you. In terms of the agreement with Nokia, do you see this perhaps engaging you with Nokia in developing or perhaps working with you in your 3G base band? And also given that you are developing CSM for LTE, could you see Nokia and NSN being engaged in working with you on that product? And then how do you see this impacting this agreement and potentially the scale that it delivers. How do you see this impacting some of your competitors in the market i.e some of the smaller vendors that lack scale and perhaps don't have the range of customers that you have?

**Sanjay Jha**

Brian, Steve has been more intimately involved in the discussions. I would defer to him on that, Steve do you want to take the first part of that question?

**Steven Altman**

All I can say is that I think that it's been pretty clear to everybody that this dispute between QUALCOMM and Nokia has been a significant impediment to working more closely together and I think that both companies are going to look for a number of opportunities to work together now that this dispute is behind us, and we look forward to it.

**Paul Jacobs**

This is Paul. I just wanted to add that I had a very good discussion with Olli-Pekka as we were concluding the agreement and we both agreed to get together quickly to talk about opportunities for the two companies to collaborate. It was a theme of our discussions throughout this whole process that there was a lot of respect between the two companies and we thought that we could do a lot to drive the industry together and I look forward to taking advantage of those opportunities.

**Sanjay Jha**

Exhibit 3, page 000061

Brian, just to add to that you would probably know that we already work with Nokia through an ODM relationship, based on our chipset, so I expect that we will certainly enhance that and given that a major obstacle has been removed in the path of our further engaging with them on the MTS chipset, I think we will engage in understanding if there is a possibility for the collaboration there.

In terms of your second part of your question, certainly I think to the extent that larger portion of the market is not obstructed for QCT opportunity, I think that some of the folks who have had preferred positions in a number of different accounts, I think that they will view this as potentially an increase in competitive pressure for them so our skills certainly enables us to deliver better products do more R&D and stay in technology leadership and we hope to be able to use all of that to convince more customers in the marketplace to use our chipsets.

**Operator**

Mike Walkley with Piper Jaffray, please go ahead with your question.

**Mike Walkley - Piper Jaffray**

Great, thank you very much and congratulations on the negotiated settlement. Bill just a little clarification on your fiscal '09 outlook of that $0.20 to $0.28. Can you let us know in terms of legal defense how much of that's included in there or say it another way how should we think about your legal defense in absolute OpEx dollars potentially declining in fiscal '09?

**Bill Keitel**

Mike that $0.20 to $0.28 estimate, it's obviously primarily revenue, but there is an element in there for reduced legal expense directly related to what we have been spending in the past on the Nokia matter. I think it's too early at this point to get into a discussion on total business model defense costs for 2009, but certainly the Nokia settlement agreement is a good and significant positive step.

**Operator**

Tim Luke with Lehman Brothers, please go ahead with your question.

**Tim Luke - Lehman Brothers**

Thanks so much. Bill just to clarify and congratulations on the deal obviously, perhaps still it might be good if you could provide a little context on what you think had been the catalyst for the timing associated with it. But the question that I had really for Bill was for the September quarter you guiding a midpoint of $0.10 for the full year fiscal '09 you are guiding a midpoint of 28, so could you just give us some sense of what is impacting the boost of September as opposed to sort of weighted throughout the calendar year? And at the same time could you give us some sense in the release it talks about an upfront payment from Nokia. Were you thinking that that will be something that you will be amortizing over the 15-year licensing deal or how would you treat that and is there some of that in the $0.20 to $0.28 guide?

And then separately, Steve, perhaps you could talk about what you feel the implications may be for some of your other licensing deals with your other partners of this landmark settlement?

**Sanjay Jha**

Steve**, d**o you want to go first on the other licensing question?

**Steven Altman**

Okay. So, Tim we don't believe that our Nokia agreement impacts out most favorite provisions which I think is what you are getting at in our other license agreements. But I would say that if we offer the package at terms of the Nokia agreement to other licensees I would be very happy if those other licensees would accept the package of Nokia's terms and conditions and provide us with the same value that Nokia will provide us under our new agreement.

**Bill Keitel**

So Tim then on some of your other questions, yes there is an upfront payment as Steve said it is a very significant payment. And that payment we are determining how that will be converted into revenue and there will be an amortization schedule of that. We are still working through that Tim, hence why we have given a fairly wide range to our earnings increment from the Nokia settlement agreement; but yes there will be an amortization of the upfront payments.

**Steven Altman**

Bill let me just, one of the other questions in term of the catalyst of getting this deal; let me just say we have been in discussions for a long time with Nokia and in terms of what was the catalyst -- who is to really know the fact is that the party is converged and we have now an agreement that I think we are both very happy with.

**Bill Keitel**

And then the last one Tim, the fourth quarter estimate versus the '09 estimate. Steve mentioned there is an upfront payment and that will be amortized. I expect the amortization to extend back in time to when payment stopped forward through to the end of 2022 and then in '09 we're looking for an increment from the resumption of royalty payments on top of the amortization.

I think that gives you a good sense of why the increase in '09 versus estimate for '08, but having said that we're still at an early stage on working through this.

**Operator**

Tal Liani with Merrill Lynch, please go ahead with your question.

**Tal Liani - Merrill Lynch**

Just trying back-count the terms of the deal; in the past you gave guidance of $0.25 to $0.30 for Nokia contribution and then you said also legal expenses I think were in the neighborhood of 300 million. So if I assume that you have reduced your legal expenses by 200 of the 300 it is $0.10 plus Nokia for '09 if I take the high end of the range of $0.30 that's $0.40. Is the discount if so -- and your midpoint for '09 is $0.24; so is the discount around 40% to 50% to Nokia versus the prior expectations or what do I do in math wrong that will kind of make the calculation wrong?

**Bill Keitel**

Now we're limited is to what we can say given the terms of the agreement with Nokia and we certainly don't want to press on the terms that we do have. But I would just add Tal that my initial estimate on the legal expense increment of that number we gave for '09 is less than what your assumption there was.

Remember that we have said its more than $300 million in terms of total business defense for fiscal '08. But we also said that the outside legal fees that we have been paying although it's the majority of it we have indicated its more closer to the $200 million range and then the balance of that total business defense is other matters and in other areas including offsets to revenue.

So, in that $200 million range of outside legal fees you have got monies we have been spending on the Nokia, trying to wrestle that one down, there has also been the Broadcom matter you have got the EC. So there are a number of areas in that $200 million or so expense and just a portion of that has been Nokia.

**Operator**

Tim Long with Banc of America, please go ahead with your question.

**Tim Long - Banc of America**

Thank you. Just two quick ones if I could first maybe Sanjay and Bill together; very strong quarter for chip ASPs yet we are guiding the overall phone asp ASP in the June quarter to be down 5% or so could you just kind of work that out for us? And then on the deal could you just give us a sense as I know you can't give too many specifics but should we assume that there's a lot of technologies announced here across 3G and 4G; should we assume that it's a constant royalty rate across all technologies or could it be different by different air interface and is it the same rate that we are

Exhibit 3, page 000063

using for the catch up payment as we are for the ongoing rate? Thank you.

**Paul Jacobs**

Steve, do you want to take the rate question by technology?

**Steven Altman**

Yes but I am afraid we can't comment on the royalty rates but there are as I said on going royalties for each of these technologies through the term of the agreement.

**Bill Keitel**

Tim, on the chip ASP versus the phone ASP, I think the key item there in that differential it's from the time we ship the chip to the time a subscriber buys the phone, that's our estimated inventory channel that we are try and track, it's not our inventory, it's others inventories. But we indicated we are forecasting that there is a bleed in that total inventory channel in the September quarter, that inventory channel will reduce.

And we think that one of the main regions that is driving some inventories that the channels a little over weighted on is in the developing regions. So, we expect ASPs of low end devices that cross the hurdle of revenue recognition for our royalty business to be a little bit different in terms of what's going through that channel relative to the MSMs were shipping that are at the start of that channel cycle.

**Operator**

[Dona Jackson] with Goldman Sachs, please go ahead with your question.

**Dona Jackson - Goldman Sachs**

Thank you very much. Just in terms of the 4G aspect of the agreement; can you just update us on what percentage of your 3G licensees at this point have also signed on for your OFDM technologies, and how you think that might change or accelerate based on this agreement?

**Steven Altman**

Let me first say under our CDMA agreement they cover multi-mode, so as CDMA transitions and we think that will be a long time out but when OFDMA gets deployed, we think there will be lots of multi-mode devices. So those are covered under our CDMA agreements today.

And so what I was talking about under the Nokia agreement is a single mode so a device that doesn't have CDMA it has all OFDMA. And I think that with already the second Tier 1 manufacture with now the largest handset manufacturer in the world signing an agreement to an on going royalties through the term of the agreement; that's a significant factor that I think will likely accelerate the success of our OFDMA licensing program, and allow us to sign us other companies. I think today we now have with the inclusion of Nokia eight companies that have signed up to single mode OFDMA agreement.

**Operator**

Ehud Gelblum with JPMorgan, please go ahead with your question

**Ehud Gelblum - JPMorgan**

Alright, thank you. It's absolutely amazing; great job. Bill just understanding a little bit more about the new guidance; it's down just correct me if I am wrong that the $0.07 to $0.13 that we are adding to fiscal year '08 therefore include some restatement of Q1 to Q3 some burping up of those quarters, so that the Q4, new Q4 number includes somewhat less than $0.07 to $0.13, that's just 0.1 so that I had to understand how the mechanics of that work? And then as well on the one payment I assume that the $0.07 to $0.13 also includes some amount of that one time payment and even though it'll amortized should we assume that more of it ends up in '08 than ends up in future years or are you assuming that it

sort of gets amortized evenly?

And then, finally on the fundamentals, one mundane question the adjustment of the total handset shipments for 2008 that includes a higher CDMA number CDMA2000 number and a lower WCDMA number, can you give some background as to what you saw in the quarter that led you to raise CDMA2000 and lower WCDMA? Thank you.

**Bill Keitel**

Sure Ehud, first on the -- let's just do the handset one first. We have in our unit estimates for calendar 2008 with this although our total range is the same as last. We have increased CDMA2000 modestly and decreased WCDMA modestly. And on the WCDMA side, we are seeing replacement rates, the replacement rate extend out just marginally longer I think in the last few weeks we have all seen some announcements where operators are experiencing situation where they are being able to hold on to their customers just a bit longer in this environment, or their customers are holding onto their handsets just a bit longer, which is basically what we have expected at the outset of the year. This reflects just a minor adjustment on what the replacement rate is -- estimate is region-by-region.

And then the CDMA2000 increment, we see that largely in the North American market and I think what we are seeing there is a strong upgrade cycle in to a category that I think many of us describe as smart phones. So that's what we're seeing in the handset market. We spend a lot time on this given how many different parties or organization or companies have been decreasing their forecast to wireless devices in the last few months and when we're going against the green we typically then apply even more effort to it. But after all that we're pretty pleased to see that our estimates for the CDMA technology as a whole are holding at this point.

Then on the your question on the fourth quarter, yes, you are correct that $0.07 to $0.13 estimate for the fourth quarter includes a catch-up so to speak from amounts owed in the past that now as result to this settlement agreement, we expect it will be what we record in the fourth quarter.

That fourth quarter amount that at this point I expect that will all be an amortization of the upfront payment, a partial amortization of the upfront payment. And as Steve said it's a very substantial upfront payment, much more than what has been owed for the past and a portion of it is a payment for the future. Okay?

**Operator**

Glenn Young with Citigroup, please go ahead with your question.

**Glenn Young - Citigroup**

Thanks. This question is for Sanjay first. I wonder if you could discuss, I mean, I understand that you can't give us any details about the potential chip relationship with Nokia at this point. But to the extent one could potentially start from today, could you just walk us through a timeline of how long it would take from today, so you could actually recognize revenues for sale of chips to Nokia understanding that you do have an OEM relationship with them and obviously now some patents or technology changes how long that might take? So that's question one.

Second thing is just a question on inventories, up again a little bit in the quarter after being up last quarter just your thoughts as to what you think inventories will do next quarter? And then lastly just thinking about the bigger picture demand outlook here because you have given us some sense as to what you are seeing on ASPs some channel inventories that are building, maybe just a comment on how you see the overall demand environment for handsets?

**Sanjay Jha**

I will take the third question about the inventory; I think we have indicated that we are changing our business model a little bit in the sense that we are taking control of inventory earlier in the cycle of chip production, so we carry a little more inventory. But we have a lot more control on how quickly we can turn them into parts and therefore our responsiveness to our customers have improved.

So that's one factor and the second factor is that you would remember that we had little shortage of parts back in the first quarter or actually in fact what we had was some more digital dye and not enough analog dye to match it and I think that is working its way through our inventory cycle. I expect our inventory next quarter will be flat to down, so and even with our current inventory I think that if you look at our revenue turns our inventory turns per year its probably industry leading. So I feel pretty comfortable about our inventory level.

Exhibit 3, page 000065

I think the third part of your question was handset demand forecast and I'll turn that over to Bill.

**Bill Keitel**

I will give you a little color of what's based into our forecast kind of on a region-by-region basis. China we are looking for modest our expectations are modest up tick from the prior quarter in terms of unit consumption. European market we are looking we think that the prior quarter was coming off a seasonal effect; dipped down as we expected and now we are looking for an up tick in the next quarter.

In India, we see that continuing strong in terms of unit consumption, now that is a region we think that vendors have stocked up pretty high on inventory. It is a strong growth market, but nonetheless we think inventories for that region not necessary in the region but for that region are a bit overbuilt. And so our forecast is there's going to be an inventory bleed in terms of units consumed versus what goes into that chipsets going into the early stages of that channel.

Japan you are coming off a very strong quarter, a seasonally strong quarter and now we look for a seasonal decrease. Korea flattish slight up tick perhaps mobile replacement market and then North America, coming of a seasonal down quarter as expected and we are looking for some up tick there.

And then the last area that I would say is just kind of rest of the world where we are still seeing a fair amount of 3G handsets being sold on to 2G networks. And we have seen strong and steady growth in all other areas; we just call rest of the world. So that's how we describe that.

Then Sanjay another question was that design-ins interval?

**Sanjay Jha**

Yeah thinking about the design without reference to Nokia specifically if I answer the designing interval in general here, there are two possible ways to get design-ins usually at the new account, either through ODMs or directly with the design team at new prospective account typically we have long standing relationships with ODM partners who have great deal of experience in our chipset and they can deliver products faster then bringing up a new team on a brand new platform.

So if we look I think that if we were to engage in ODM relationships with a new customer, revenues could be recognized in 2010 fiscal 2010 at the earliest, I believe.

**Operator**

(Operator Instructions). Mark Mckechnie with American Technology, please go ahead with your question.

**Mark Mckechnie - American Technology**

Great, thank you and congrats on the settlement, it sounds like good deal for both. I wanted to ask a question here for Steve on pass through rights and specifically does QUALCOMM actually get pass through rights on some of the Nokia GSM patents for your customers? I'm really just trying to figure out is would LG or Samsung or an Apple if they use your chips be free from Nokia IP issues by using the QUALCOMM chips? Thank you.

**Steven Altman**

We did not get pass through rights, but we did get assignment of the significant number of patents which we would be able to offer as licenses to our customers. So companies that buy chips from us similar to buying chips from other companies would -- to the extent they use Nokia IP would negotiate with Nokia, the terms of a license agreement to those companies.

However, Nokia did agree to cap what royalties they would charge for customers that are using our chips in a fashion that I'm very comfortable with.

**Sanjay Jha**

Exhibit 3, page 000066

And may be I'll add just a little more to that, I believe that we have a position through some of agreements that are already in place, to pass more rights to our customers than we believe anybody else in the industry Mark. So I think that we're already in a good position to pass through rights to our customers.

**Operator**

James Faucette with Pacific Crest, please go ahead with your question.

**James Faucette - Pacific Crest**

Thank you very much. Most of my questions have been answered, but I actually just want to follow-up on Mark's question. If you didn't get full pass through rights in the agreement with Nokia, at the very least do you have broad access to their IP portfolio for incorporation into your chipsets and products in the future? That's my first question and second question is probably for Bill; you mentioned a little bit you'd seen a little bit of an extending of the replacement cycle particularly for WCDMA. I would assume that has happened primarily in Europe, can you talk to if that's in fact the case and if you've seen extending of replacement cycles in any other geographies? Thank you very much.

**Steven Altman**

In answering the first question, yes, the answer is yes. We have full access to all their patents to be able to incorporate all their patented technology into our chips.

**Bill Keitel**

James, then on the replacement we've anticipated an extension on that replacement cycle from the outset of the year. We think 2007 is around 47% rate and we think 2008 will end up at about 43% rate. And so we're looking at that extension broadly across many geographies. In this case our updated guidance for unit shipments of all CDMA technologies in 2008, we saw that cycle just widen a bit more than what we had previously expected. And you are correct that was in Europe in the WCDMA, yes.

**Operator**

Kulbinder Garcha with credit Suisse, please go ahead with your question.

**Kulbinder Garcha - Credit Suisse**

Thanks and just a couple of clarification. First of all on the pass through rights, was my understanding correct Steve that it sounds like Nokia would be able to cross buy some of your own license fees and what does that mean for the cumulative industry royalty rate for WCDMA? I think there has been some concerns many years on this and what confidence can you give us outbound costs if the litigation is years down the road? That's my first question and my second question is for Bill, I won't go back to the guidance. As I understand and tell me if I am wrong the $0.07 to $0.13 EPS guidance or impact from Nokia kind of assumes an accelerated impact that won't be there on an ongoing basis in 2009. Is my understanding right?

**Steven Altman**

Okay, on the first question is it's basically a royalty stacking question and my experience has been, and I believe it will continue to be this way is that royalty stacking in CDMA and WCDMA has been really a myth. We have a substantial pass through rights from many companies as Sanjay was saying, and those will obviously continue to exist.

When you think about Nokia and their licensing program, they are going to -- to the extent they want to establish a licensing program and collect royalties; negotiating with companies like Samsung and Motorola and LG, these are other also companies that have substantial patent portfolios, significant patents as well. And so when you look at Nokia's business their business is primarily a handset business and they are not they don't drive the same kind of value that we drive on with respect to IPR and royalties.

So I think it will be typical in this industry for these large handset manufacturers to do royalty-free cross-licenses and so I kind of suspect that's what will continue to occur and so many of our important and large customers and our important and small customers won't have the kind of royalty stacking issues that you referred to. In addition as I said, when they

Exhibit 3, page 000067

use our chips, they've agreed to cap the royalties they would charge at levels that I think our customers to the extent they do have to pay will be able to compete quite well.

**Bill Keitel**

On the question on the acceleration point, so let me just backup again on that. I think we all recall that Nokia stopped paying QUALCOMM royalties after the first week of April 2007, and this settlement agreement, in this settlement agreement both parties have agreed the amount that covers both the past and defines the rate for the future. And as we pointed out there is a significant upfront payment and I indicated, I expect we will amortize that payment from over that entire cycle from April 2007 through the end of 2022 and then there is a resumption of royalty payment on top of that.

So again what we expect to record in this fourth quarter fiscal quarter of 2008 will be a payment that reflects due consideration for the use of our IP from April 2007 through the fourth quarter of fiscal 2008. And then next year there will be an amortization and a resumption of payments as well.

**Operator**

Richard Windsor with Nomura, please go ahead with your question.

**Richard Windsor - Nomura**

Alright, thanks very much. I wonder if you could talk a little bit about obviously it would appear that Nokia has got some kind of discount and that you are making up that value by getting some or they have assigned to you some of their patents. I was just wondering seeing as any way you could really get value from those patents seeing as charge higher royalties to your customers. How you actually and seeing as you charge a flat rate for all your patents, how you are going to derive value from the patents that they have actually assigned to you to make up the balance of value?

**Steven Altman**

Well, I am not going to go in to much detail on that. I think we received some valuable patents in a number of areas including some areas that we haven't licensed today such as GSM. But in terms of how we derive additional value from those patents, I am not at this point ready to give much detail on that.

**Don Rosenberg**

This is Don, I would add that there's lots of ways that one derives value from patents. Patents as you indicated from offensive perspective or licensing perspective there is also a defensive value to patents as well. So there is a lot's of value to good patent portfolio.

**Operator**

Brett Simpson with Arete, please go ahead with your question.

**Brett Simpson - Arete**

Thanks very much. I have a couple of questions for Sanjay. First up, maybe on USB modems and data cards. I guess some of your customers are seeing some significant growth guys like Huawei and ZTE and Unipeir. And can you give us maybe a sense for the size of the business that you have in this space and what sort of growth outlook you see as markets like China and Russia and Brazil start to launch services over the next 12 months? And maybe just a follow-up; you made acquisition in Bluetooth and WiFi a few years back and we have not seen product as yet, can you maybe just give us an update us to where you are and when you expect to start booking revenues for connectivity? Thanks.

**Sanjay Jha**

Brett on the USB modem and data card side, indeed we are seeing pretty significant growth and in fact that's one of the places where our customers like Novotel, Sierra and Option, Huawei and others have done extremely well in driving marketplace both in terms of driving sales for us, but also for the carriers driving data ARPU and data revenue.

Exhibit 3, page 000068

We see continued growth in that and as you know while the USB modem data card business is very strong, with the Gobi initiative we are enabling embedded modules and the prices there -- we have with our business model driving the prices to a place where we see more and more laptops being embedded with these modules. So that is an important marketplace for broadband wireless data.

With respect to your second question about Bluetooth and WiFi we are already in Bluetooth booking revenue for Bluetooth shipments, our shipments per quarter is already in multiple million unit. In Bluetooth in fact I think we are doing extremely well in Bluetooth. In WiFi, we have had some challenges as I have shared with you in different forums, and we are now focused on integrating WiFi cores into our higher end chipset, that's become the strategy as opposed to a focus exclusively on the laptop marketplace, a market which has been very competitive and has been served very well by number of other partners.

We see the largest growth of WiFi now being driven by handsets and smart phones and that is our focus in WiFi.

**Operator**

Maynard Um with UBS, please go ahead with your question.

**Maynard Um - UBS**

Hi, thanks. Just looking at your fairly strong MSM guidance, can you just help us balance that with the macro-economy with your guidance and also how that balances with your comments that handset channel inventories will come down next quarter? And a quick one for Steve, anything here that helps you in the Broadcom or EC cases? And lastly Bill just wondering why you are amortizing the catch-up payments from the prior quarters? Thanks.

**Bill Keitel**

I will take a couple there, Maynard, in terms of the amortization we are going to be booking a fairly significant deferred asset and then it's how you -- what's the appropriate way to bring that deferred asset onto the P&L. So, at this point we've concluded that the best means is an amortization that I don't think we're going to need an ongoing information flow from Nokia to bring that asset on to the P&L.

It's a very extensive settlement agreement, there is a number of value facets to it and all things combined it just seems like the appropriate way to do it and we're still working through an amortization schedule before we conclude that. And your point about the strong MSM guidance versus the macro environment and first I would just add, I would say that in terms of the macro environment again, we're probably going to bid against the tide that what many people or parties or organizations have been saying in the last couple of months in terms of how they see their view of the total wireless market or their view of their position in that wireless market.

I think what's clear here is that CDMA technologies are progressing very well this year and there are some of the older technologies that are starting to drop-off. So I think that's one aspect of it and then the other one is we serve the entire world with CDMA technologies [Sanjay's] business is in the chipsets and, we sell where others might be more regionally focused or products that are more segment focused in one segment or another we're worldwide and I think QCT has got the broadest chipset portfolio of any supplier into this 3G market.

So, I think when it comes down to how well the 3G is doing in this market relative to the older 3G variations number one and number two we're broadly diversified and benefits I think are showing through.

**Steven Altman**

On the Broadcom question, maybe Don that would be a good one for you to respond to?

**Don Rosenberg**

Yes, was the question on how does this impact or does it affect the Broadcom situation?

**Steven Altman**

Right.

Exhibit 3, page 000069

**Don Rosenberg**

The answer is it's really not related to Broadcom, we obviously have some ongoing disputes with Broadcom as well, and those are separate and distinct from any disputes we've had with Nokia.

**Operator**

We've reached the end of the allotted time for questions today. Dr. Jacobs, do you have any closing remarks.

**Paul Jacobs**

Just wanted to thank everybody for joining us this morning and we certainly appreciate your flexibility with last minute changes, but hopefully you thought it was worthwhile. Obviously, we are extremely pleased to put the dispute with Nokia behind us and really feel like the company has found a way to a win-win scenario, and so we are all looking forward to a closer collaboration between the companies.

And I think that will really help drive the wireless industry forward and I am certainly happy to avoid an escalation which would definitely have been detrimental to the entire industry and I just want to thank our team that worked on this again for just a great effort.

Obviously, over this period, the questions and concerns about Nokia have often overshadowed the performance of the company and I just want to highlight again that through this period our employees and our partners continue to execute extremely well and I am very happy to see that.

As we put this behind us, it's really going to allow us to allocate our resources in an even more focused fashion to address the opportunities that are created by the growth of 3G and as we look out to other advanced wireless technologies.

On a personal level, I have to say I am excited to be able to spend more of my time and attention on some of the great new technologies that we are working on and great products and also to work more closely with our partners including Nokia, but also a lot of others in consumer products and computing space the content areas.

So just tremendous amount of opportunity ahead of us, we are excited to be in the position that we are in we look forward to continuing to deliver great results to you. Thanks a lot.

**Operator**

Ladies and gentlemen this does conclude today's conference call you may now disconnect your line.

**Copyright policy:** All transcripts on this site are the copyright of Seeking Alpha. However, we view them as an important resource for bloggers and journalists, and are excited to contribute to the democratization of financial information on the Internet. (Until now investors have had to pay thousands of dollars in subscription fees for transcripts.) So our reproduction policy is as follows: **You may quote up to 400 words of any transcript on the condition that you attribute the transcript to Seeking Alpha and either link to the original transcript or to www.SeekingAlpha.com.** All other use is prohibited.

THE INFORMATION CONTAINED HERE IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL, CONFERENCE PRESENTATION OR OTHER AUDIO PRESENTATION, AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE AUDIO PRESENTATIONS. IN NO WAY DOES SEEKING ALPHA ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S AUDIO PRESENTATION ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

If you have any additional questions about our online transcripts, please contact us at: transcripts@seekingalpha.com. Thank you!

## Latest articles on QCOM

Exhibit 3, page 000070

- Qualcomm's Future Growth Should Come from Smart Books Oct 14, 2009
- Monday Options Update: NBR, MGM, QCOM, AYE & TIBX Oct 12, 2009
- Qualcomm: A Promising Leader in Mobile Internet Oct 11, 2009

Add QCOM to your portfolio

Exhibit 3, page 000071